. . aintiff.
. ine Way
. 92111
. 58) 277-2026.

FILED
08 MAY 22 AM 10:58
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY: DEPUTY

////

////

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| John Cobb, Plaintiff,<br>vs.<br>1.) J. Reyes ( ID 606 );<br>2.) S. Gustafson ( ID 601 );<br>3.) Lt. Tom Morris ( ID 691 );<br>4.) William MacIntyre ( ID 617 );<br>5.) Lt. David Rose ( ID 690 );<br>6.) U.C.S.D. Police Chief O. King;<br>Prosecutors:<br>7.) Michael Hudson;<br>8.) Mike Aguirre;<br>9.) Bonnie Dumanis;<br>Public Defenders:<br>10.) Shane McKay;<br>11.) Steven Carroll;<br>12.) Does 1 through 100;<br>Defendants. | **DECLARATION AND ANALYSIS IN OPPOSITION TO MOTIONS TO DISMISS.**<br><br>**[ Case Number: 08-cv-0188-JAH-WMc ].**<br><br>Date: June 23, 2008<br>Time: 2:30 p.m.<br>Department: 11.<br>Judge: Hon. John A. Houston. |

////

////

## INDEX OF EVENTS


| Chapter Sections | Title | Page |
|---|---|---|
| I | U.C.S.D. Battery; Discriminatory Law Enforcement; 2-10-1993 | 1 |
| II | S.D.S.U. Illegal Arrest; 7-24-1997 | 34 |
| III | U.C.S.D. Field Interview Report ( Loitering ); 2-5-1999 | 59 |
| IV | S.D.S.U. Restraining Order Extension; 9-12-2000 | 63 |
| V | U.C.S.D. Loitering; 2-3-2006 | 65 |

# I. DECLARATION AND ANALYSIS BY JOHN COBB

## U.C.S.D. Briggs Situation ( Dated 2-10-1993 ).

( Exhibits – Original Complaint ( " O.C. "), No.s 3-9; This Motion (" T.M. "), 1-2. )

I, John Cobb, declare as follows:

## Abstract

## ( Current Understanding of Defendant John Cobb of Briggs Incident And Relation to Constitutional and Statutory Law )

First, my First Amendment right to free speech was violated when, after telling the U.C.S.D. police officers what Ms. Briggs had done to me, the police unlawfully arrested me, and eventually placed me into County Mental Health.

My Fourth Amendment right against unreasonable seizures ( applicable to the States by the due process clause of the Fourteenth Amendment; *Mapp v. Ohio*, 367 U.S. 643 (1961) ) was violated by being arrested and transported to the U.C.S.D. police station and eventually to County Mental Health.

Following this, there was a conspiracy by the U.C.S.D. police, and San Diego City Attorneys, to cover up this illegal arrest and seizure. This involved a falsified police report ( Original Complaint ( " O. C. " ), Ex. No. 3 ) and perjury being committed by a witness ( Original Complaint ( " O. C. " ) Ex. No. 4, last page ).

Violation of my First Amendment Right to freedom of speech is described in more detail as follows:

At the scene, I told Officer MacIntyre ( exercised my first amendment right ) that Briggs was lying ,and that she had walked into me. I was then arrested, and placed into handcuffs, and put into a police car. After this, I was taken to the police station. I exercised my Fist Amendment Right to Free Speech, and told U.C.S.D. Police Officers MacIntrye and Rose what had occurred – that Brigg's had walked into me, kicked me, etc. ( I showed the officers Briggs' foot prints on my white pants, and told of the scratching ). These officers then conspired and acted with malice, with a conscious disregard to my constitutional right of free speech, and in retaliation and vindictively, examined my eyes with a measuring device, and upon finding nothing ( as proved later by the County Mental Health Lab Results – This Motion ( " T.M.", Ex. No. 2, last page ),

further acted with malice, by stating that I was mentally ill, and further violating my Fourth Amendment right, by taking me to County Mental Health through claiming that I was " mentally ill " ( This Motion ( " T. M. " ) Ex. No. 1 ). This mentally ill claim was proven to be false by a psychiatrist at County Mental Health – Refer to T.M. Exhibit No. 2 – " Pt is not holdable by 5150 criteria and is released to home ".

Following this, the San Diego City Attorney(s), determined that Ms. Briggs, and witness(s), were saying that Ms. Briggs and Def. John Cobb bumped into one anther, as opposed to, what the police report said that Briggs said, which was, that I, John Cobb, approached her, and pushed her down. To cover this up, Ms. Briggs was made to go back to the U.C.S.D. police station, and write, under penalty of perjury, a statement, that I, John Cobb, approached her and pushed her down.

**Evidence of Police and Witness Conspiracy**

The sequence of events transpired chronologically as follows:

i. the incident occurred – Briggs walks into Cobb;

ii. U.C.S.D. Police Officer MacIntyre arrives;

iii. John Cobb ( me ) is arrested by Officer MacIntyre and removed for the scene;

iv. Briggs original story, is that she bumped into John Cobb or they bumped into one another: At the trial on 11-15-1992, witness Mark Esquierdo stated that on the date of the incident, Ms. Briggs stated that:

" A UH, I THINK SHE SAID THAT SHE WAS JUST WALKING AND BUMPED INTO HIM, OR THEY BUMPED INTO EACH OTHER. "

[ Ex No. 14; Trial Transcript; Page 27, Line 8-9 ];

v. Police Officer MacIntyre takes Cobb to county Mental Health;

vi. Office MacIntyre writes a falsified police report ( O.C. Ex. No. 3 ) to justify the arrest of Cobb. Alleged falsification; that Briggs stated that " Cobb rushed up to her " like a football player " ". Known falsification; that Cobb said at the scene that he was being harassed by women, ( actually stated for the first time at the police station ) – so as to justify the initial arrest at the scene.

vii. Briggs commits felony and perjury by falsifying a written witness statement ( O.C. Ex. No. 4 ) where she says that Cobb " charged me ".

**Specific Evidence of Police Covering Up Defendant Cobb's False Arrest**

The U.C.S.D. police, and Office Macintyre, unlawfully arrested me ( arrested my for a misdemeanor not committed in his presence – none of the exceptions applied: PC § 836 (a) (1) ), and then went about trying to justify this unlawful arrest. This involved using a group of excuses; false statements of facts, and misapplication of the laws, to justify their actions.

I was arrested very soon after Officer MacIntyre arrived. I was placed in handcuffs, and then escorted to a police car, and waited there for 40-60 minutes, and then taken ( transportation ) to the police station, and then taken ( further transportation ) to County Mental Health. None of these actions were reasonable or lawful.

The excuses used by Officer MacIntyre to justify this unlawful arrest are as follows:

i. Falsely stating that Def. Cobb, at the scene, was becoming more and more hostile, so he then put handcuffs onto Def. Cobb, and placed Cobb into a police car for officer safety reasons. [ O.C. Ex. No. 3; Police Report, Page 4 ]. This is from U.S. Constitutional law, which allows the police to protect themselves when conducting a *Terry stop*; Terry v. Ohio, 391 U.S. 1; and

ii. MacIntlry then drove Def. Cobb to the police station. [ O.C. Ex. No. 3; Page 4 ]; and

iii. Falsely stating that Def. Cobb said at the scene ( before being arrested ), that women were always waking into him. [ O.C. Ex. No. 3; Page 4 ]. This is not true, Def. Cobb made this ' women walking into him.' statement, for the first time, *after* being arrested, and already haven been taken to the police station; and

iv. Def. Cobb showed the two officers Briggs' foot prints on his white pants, and also told of Briggs' scratching his face. This was not recorded into any evidence. Further, the two police officers went on a fishing expedition, and examined Def. Cobb's eyes with a metering device. This was to justify taking Cobb to County Mental Health; and

v. Upon finding no evidence of drugs, the two police officers justified the illegal arrest, by falsely claiming that Def. Cobb was " Mentally ill ☒ " [ T.M. Ex. No. 1; Page 2. ].

vi. The psychiatrist at County Mental Health, states that Def. Cobb was not mentally ill –

" not hold able by 5150 criteria " [ T.M. Ex. No. 2, Page 2 ]. This psychiatrists' report does indicate that Def. Cobb told of Briggs battery upon Def. Cobb.

Welfare and Institutions Code § 5150 criteria requires " probable cause " ( a reasonableness standard ) to take a person to a " Mental Health " facility for a "72-hour" " treatment and evaluation ". [ W. & I. Code § 5150 ]. Def. Cobb understands this includes being drunk in public, being on drugs in public, being suicidal, and being a threat to others. The psychiatrist at County Mental Health, stated that Def. Cobb was none of these.

> " Patient is cooperative and pleasant He is without behavioral disturbance.
> He has no odor of alcohol and no pressure or slurring of speech ...
> Pt remained calm, cooperative and with [ added; " no " ] threatening
> or bizarre behavior. UDS NEGATIVE. Pt is not holdable by 5150
> Criteria and is released to home. ". [ T. M. Ex No. 2, Page 2 ].

( Note that, in the Section XVIII – U.C.S.D. Loitering Incident, ( Dated 2-3-2006 ), I ( John Cobb ) heard the dispatcher talking to the U.C.S.D. police officers, and using the term " 5150 ". ). Refer to page 132.

In this Briggs incident, the U.C.S.D. police had no probable cause to arrest me, and take me Def. Cobb ( myself ) to County Mental Heath. There was no probable cause to examine me for drugs. Upon determining that there was no evidence of drug usage, I was falsely classified as being mentally ill, and this was then used to unreasonably and unlawfully take me to County Mental Health.

## Preface

I was the victim of what I now know to be *harassment* by white ( Caucasian ) females during my education at U.C.S.D. ( 1984-1987 ). This harassment continued into the 1990's. There have also been comparatively a small number of incidents of this harassment in the 2000's.

The 1980's harassment involved white females purposefully walking into my path when I would walk between classes. This started immediately after I was accepted into the U.C.S.D. upper division Computer Science Program in 1986.

While I was a student at U.C.S.D. in the 1980's, on 2 to 3 occasions of the females walking

close to me and then making me move out of their way, a U.C.S.D. Police Officer would arrive shortly after this. This officer would be looking at me. This officer was always the same, older, black, male officer. I believe that he was a Sergeant. This officer did not ever contact me. I believed at the time, that he knew that I was being harassed by these female students. I did not know at the time of PC § 626.6; which can be used to tell non-students and non-employees to stay off campus. This same black officer did this same type of thing, with me, arriving and checking me out, just after a female incident, on 1 or 2 occasions, in the mid 1990's.

This U.C.S.D. harassment, and further non-U.C.S.D. harassment, is described more fully in the <u>Miscellaneous Events and Facts, Chapter Section XIX.</u>

### A. <u>John Cobb Short Declaration of Briggs Situation</u>

On 2-10-1993, I was walking along the left side of a side walk, immediately next to the bushes. ( I had gone to U.C.S.D., to the library, to use the internet ). I looked over and saw Bridgett Briggs walking parallel to me, about 3-4 feet over from me, to my right. She was looking down, then looked up, looked over at me, then got angry looking, and then got a look in her eyes that she was going to do something, and then walked to immediately in front on me. Usually these women would veer off after doing this, but Ms. Briggs kept on going. She kept going, I started to slow up, I felt something touch my hand, and then I pushed her aside, and she fell into some bushes on my left. I kept walking. She then got up, and ran after me with her hands / finger tips, directed towards my eyes. I stopped, turned around, and held onto her hands, she then started to kick me, she managed to scratch my face with one of her nails, I then tipped her hands back and she sat down, and started kicking me as she sat upright. I then kicked at her legs a couple of times, to deflect her blows. I turned around and walked away again, and she got up again and ran after me, this time grabbing my backpack. She was using her weight to pull on it, and I started to yell let go, repeatedly. This is when three white males arrived.

## B. CONSTITUTIONAL VIOLATIONS OF DUE PROCESS AND EQUAL PROTECTION: Illegal Arrest and Discriminatory Investigation Situation – Cover-Up of Briggs' Crimes.

### i. No Independent Determination of Probable Cause Before Arresting John Cobb.

Following this, U.C.S.D. Police arrived ( MacIntyre; Id No. 617. Currently works as a Detective at U.C.S.D. ), and I was issued a citation. Ms. Briggs was never issued a citation with regards to this situation. The sequences of events are portrayed differently. The following describes three different descriptions of events, and shows a change in Officers MacIntyre's statements.

A. My ( John Cobb Declaration ) sequence ( I observed the following ):

1.) MacIntyre arrives, talks to Briggs.

[ Initially, Briggs gives MacIntyre a type of glaring expression, with her eyes. Like she was communicating status or something. Officer MacIntyre observed this / noticed this, so to speak. He had deference to this. ]; then

2.) MacIntyre talks to John Cobb ( me ); then

3.) "arrests" John Cobb, and Cobb calls MacIntyre a "prick";

4.) Cobb placed into police car; then

5.) talks to witnesses ( while Cobb in police car ); then

6.) takes Cobb to Police Station, where Cobb, for the first time, mentions to Officer MacIntyre that women were repeatedly waling into his path.

7.) Cobb tells full story to MacIntyre at police station. Points out Briggs; foot prints on his pants, etc.

8.) After this, Cobb then tells full story to Sgt. Rose. Also Points out Briggs's footprints on his pants, to Sgt. Rose. ( Sgt. Rose is now a Lieutenant at the U.C.S.D. Police Dept. ).

9.) I ( John Cobb ) was then taken to County Mental Health.

10.) I told the same version to a Dr. Bowlus ( psychiatrist ).

11.) Dr. Bowlus writes a report; this is Exhibit No. 5 ( refers to Cobb being scratched and kicked by Briggs. )

B. MacIntyre Version in Police Report [ Exhibit No. 9, Page 4 " OFFICERS OBS/

ACTIONS " ]:

1.) talks with Briggs; [ Exhibit No. 9; Page 4; Line 5 ];

" UPON MY ARRIVAL . . . I FIRST SPOKE WITH BRIGGS, ... "; then

2.) talks with Cobb; [ Exhibit No. 9; Page 4; Line 6 ];

" I THEN WENT TO TALK WITH COBB "; then states

3.) " BASED UPON THE VICTIM AND WITNESS STATEMENTS I PLACED HANDCUFFS ON HIM AND PUT HIM IN THE BACK OF MY PATROL CAR FOR OFFICER SAFETY REASONS ".

C. MacIntyre version at trial [ Exhibit No. 14; Page 34; Lines 10 – 25; and Page 35; Lines 1-22 ]:

1.) talks to one of the witnesses; then

2.) talks to Briggs; then

3.) talks to John Cobb.

The above situation occurred as follows: Officer McIntyre arrived and spoke to Briggs – I heard what she said. She also put her hands into her pockets, moved to the side of the path, next to the bushes, and looked down, and walked along the path a little. At this time, I do not recall what she said, but the police report says that she said that I rushed up to her " like a foot ball player " and pushed her into the bushes. Note that, a witness at the trial ( Ex No. 14; Trial Transcript; Page 27, Line 8-9) stated that he heard Ms. Briggs say that she bumped into me, or that we bumped into one another.

Officer MacIntyre then spoke to me. I said something like – she's lying, she was on the other side of the path, she walked over to my side of the path, and started walking into me, and I pushed her aside. There's obviously going to be a trial with lawyers and everything, that's all I'm going to say. Officer MacIntyre then said he was "arresting" me. I then said to MacIntyre that he was a " prick ".

I did not say ( at this time ) to any police officer, that women at U.C.S.D. had been walking into my path for years. I said this later, at the police station. The police report has been falsified, to state that I said this at the scene of the incident. This was to cover up the false arrest at the scene, and unreasonable seizure – to justify taking this false arrest, and the taking of me to county

mental health as mentally ill.

**ii. Officer MacIntyre Learns of Two Differing Versions**

At this point, Officer MacIntyre would have learned and understood that events had occurred prior to the bag struggling – i.e. the police report states that Office MacIntyre received a " radio call " only to " that a male and a female were struggling over a backpack ". [ Refer to Exhibit 4; Police Report, Page 3, Top of page; under " ORIGIN ". ]. He would further have known that there were two differing versions of what occurred before the bag struggling; Briggs version, and my ( John Cobb's ) version.

I was then arrested by Officer MacIntyre. [ Officer MacIntyr could not have lawfully arrested me for a misdemeanor not committed in his presence. At this time, Officer MacIntyre had been a police officer for 9 years – from his testimony at trial; Ex 14; P 33; L 10-17. It is alleged, that he arrested me to isolate me from the other witnesses, and to stop the other witnesses from hearing what I would say about the incident. Refer to Section iii, below. ]. When told that I was being arrested, I then said to Office MacIntyre that he was "a prick ". I was then immediately placed in handcuffs, and taken away from the scene, and placed inside a police car. This isolated me, from the other witnesses; Baum, Kennedy, Hansen, and Esquierdo. Refer to discussion below. Officer MacIntyre, presumably, took the witness statements, while I was sat in the police car. I could not see or hear this. I was in the police car for about 40 minutes to 1 hour.

I was then taken to the police station, where I noticed for the first time Briggs' foot prints and scuff marks on my white pants. I pointed this out to both Officers MacIntyre and later Sgt. Rose ( once to MacIntyre, and later to Sgt. Rose, I think Macintyre had left the room ), but these statements by me were never put into any police report. I also told of Briggs scratching my face. ( Note, the only memorialization of what I said, was the psychiatrists report, made at County Mental Health – T. M. Ex. No. 2 ).

I was allowed to show the white pants at the trial before Judge Hayes, but no Cobb's day-of-arrest pointing out of these foot print marks ( to MacIntyre and Sgt. Rose ) was achieved / established during the Trial. I was found guilty, but no witness testified that Briggs kicked me.

It was also at the police station that I stated, for the first time, that women were constantly walking into my path. This is contrary to the police report. The report states that I was not

arrested, but instead, taken to County Mental Health.

a. **With Regards To Trial Testimony – One Sided Police Investigation.**

At the trial on 11-15-1992, witness Mark Esquierdo stated that on the date of the incident, Ms. Briggs stated that:

" A UH, I THINK SHE SAID THAT SHE WAS JUST WALKING AND BUMPED INTO HIM, OR THEY BUMPED INTO EACH OTHER. "

[ Ex No. 14; Trial Transcript; Page 27, Line 8-9 ].

That Ms. Briggs stated that she bumped into me, John Cobb, or that we bumped into one another is not stated in Officer MacIntyre's police report. Further, it is not stated in Officer MacIntyre's police report that Ms. Briggs stated that she bumped into him, or that they bumped into each other, and then made a different statement of;

" COBB RUSHED UP TO HER " LIKE A FOOTBALL PLAYER " AND WITH BOTH ARMS/HANDS EXTENDED PUSHED HER DOWN TO THE GROUND AND INTO THE BUSHED. ". [ Ex No. 4; Police Report, Page 3 ].

Assuming that a U.C.S.D. police officer heard this, it evidences a discriminatory, damning, and one-sided police investigation.

iii. **No Right to Arrest; Arrest Was A Violation of PC § 836 (a) (1).**

Officer MacIntyre, did not witness my battery upon Ms. Briggs, but then he arrested me ( John Cobb ). To arrest without the misdemeanor being committed in his presence was a violation of PC § 836 (a) (1) ( right to arrest for misdemeanor can only be done if the misdemeanor is committed in the officer's presence ). The exceptions to PC § 836.(a) (1) did not apply in this Briggs incident.

iv. **Def. John Cobb's Isolated From Male Witnesses To Cover-up Testimony – Evidence Tampering.**

Officer MacIntyre arrived at the scene knowing only of a male and female struggling over a Backpack. He then learned that I said that Briggs approached me, and walked into me. I was then illegally arrested by MacIntyre, and taken far away from the scene. Legally, he could only have issued me a citation, and could not have taken me into custody ( removed me from the scene ). He falsely stated ( in his police report ) that I was hostile. He could have put me into

handcuffs for officer safety reasons, but this would not have removed me from the presence of the four male witnesses. He arrested me and took me to a police car. On the date of the incident, he said he was arresting me. At this time, MacIntyre had already been a police officer for nine years; at three different agencies; S.D.S.U.; City of Escondido; and one year at U.C.S.D.

After being arrested, I was taken far away from being in front of the 4 male witnesses, and no longer in the presence of the 4 male witnesses. We were no longer able to see and hear one another. This prevented me from saying anything else in front the four male witnesses. Saying something which these male witnesses could later testify to at a trail.

They could have testified to, that there was probable cause to issue a citation against Briggs. That I described her approaching me three times, running after me, trying to push her finger nails into my eyes, scratching my face, running after me to kick me, kicking me multiple times, and then running after me again to grab my back pack. That they could later testify to, that there was actual probable cause to issue a citation for violation of the law to Ms. Briggs; e.g. a citation for battery, committed upon the person of me, John Cobb. Officer MacIntyre had obviously decided that Ms. Briggs was above the law, and that I, John Cobb was not. That I was to be issued a citation for battery, and Ms. Briggs was not.

Officer MacIntyre then wrote a police report, and was the sole author of this police report. Sgt Rose ( Currently, as of 8-6-2007; Lt. Rose; Id No. 690 ) was on the scene, but did not author any police report statements. This report grossly falsified what occurred between me and Ms. Briggs. Grossly falsified what happened in terms of what the male witness statements said. Ms. Briggs was not issued any citation for battery against me.

If officer MacIntyre had followed the law, he would have issued me a citation, and then not taken me into custody, and not taken me away from the scene. This would have left me within the presence ( talking and hearing distance ) of the witnesses. The witnesses could have testified to hearing me give a full account of what happened. Like I did later, for a total of three times: Two times at the U.C.S.D. Police Station ( both to MacIntrye and later to Sgt Rose; and there is no memorialization of this ), and then to Dr. Bowlus at CMH ( there is memorialization of this ). The witnesses never heard me saying that Brigg's attacked me the three times.

To reiterate: I later was taken to the police station, also away from any witnesses. Here, I

subsequently made two further statements to Officer MacIntyre and to Officer Rose. Neither of which was put into any police report – Exhibit No. 4. If I had made my police station and CMH statements before the four male witnesses ( Kennedy, Baum, Hansen and Esquierdo ), they could subsequently testify to what I said at the trial. My CMH statement was memorialized into a report – Exhibit No. 5.

This isolation also stopped me from hearing what the male witnesses said to the police.

Further, the U.C.S.D. police department could have assigned more that one police investigator to the investigation. And had independent ( apart from MacIntyre ) police memorilizations of the male witness statements. Police Officer MacIntyre was the sole author of the related police report. The sole author to what each of what six (6) people said: Cobb, Briggs, Kennedy, Baum, Hansen, and Esquiredo said.

The actions of Officer MacIntyre, of *immediately* removing me from the presence of the four male witnesses, of writing me a citation for battery, and not one to Ms.Briggs, could imply that he recognizes me, and knows of my harassment history at U.C.S.D. and that there is a prearranged plan to cover up any assaults and batteries committed against me.

**v. <u>With Regards to What Witnesses Were Called to Testify at the Trail.</u>**

I at first, was acting as my own lawyer. During this time, I received from the City of San Diego a list of their witnesses. This is Exhibit No. 10. The City Attorney sent me a list of 8 ( eight ) witnesses; which were: Officer W. MacIntyre UCSDPD, Officer David Rose UCSDPD, Bridget Briggs, Mark Esquiredo, Todd Kennedy, Andrew Baum, Brian Hansen, and Cecelia Jamous. Further, I spoke via telephone with somebody at the City Attorneys Office on 9-10-1993. I was told that " 4 witnesses and 3 police officers " would be called [ Exhibit No. 10; Last page. ].

I retained the services of defense Atty. Thomas Marshall on 10-14-1993. The prosecution witnesses who ended up testifying at the trail were the 5 ( five ) witnesses; Briggs, Esquierdo, Hansen, MacIntyre, and Jamous: [ Exhibit No. 14; Page 81 ].

**vi. <u>Vindictive U.C.S.D. Police Examination of John Cobb.</u>**

**<u>( Violation of John Cobb's Constitutional Rights ).</u>**

While at the police station, this is where I told both Officers MacIntyre and ( later ) Sgt. Rose the complete story ( more or less ) of what happened. This was not documented or made a matter of

record, and not memorialized into any U.C.S.D. police report. E.g., taking photographs of the foot prints on my white pants, of the scratch, or writing into the police report, my indications and statements of the foot prints on my white pants to the police officers involved. I later told of what happened at CMH to Dr. Bowlus, and this was memorialized into a report. Compare Exhibits No. 4 with Exhibit No. 5.

After making my statement at the police station, to both Officer MacIntyre, and Sgt. Rose, Officers MacIntyre and Rose examined my eyes. Instead of writing into a police report what happened, and taking photographs of the footprints on my white pants, and of any scratches on my face, I was investigated further. This evidences malice and vindictiveness.

Officer MacIntyre used a meter to measure the dilation of my eyes. He asked me if I were on drugs. I said no. Then Officer Sgt. Rose came in and partook in measuring my pupils. They also took a pencil, and asked me to hold my head still and follow it with my yes as they moved the pencil from left to right. The police officers asked me a couple more times if I were on drugs, and I repeatedly said no. I was then taken to County Mental Health. The results of the U.C.S.D. eye investigation was not documented into any police report.

This is evidence of vindictiveness and retaliation on the part of the two U.C.S.D. police officers. I exercise my right of free speech, and I am then investigated further, then seized, and taken to CMH without probable cause.

### vii. <u>Actually Arrested vs. Pretext of Being W. & I. § 5150 Patient</u>

I, John Cobb, was actually illegally arrested by U.C.S.D. Officer MacIntyre. This was morphed and changed into the taking of me to County Mental Health ( "CMH " ), using the false excuse of me having a mental disorder, and being a Welfare and Institutions Code § 5150 individual / patient. Refer to Welfare and Institution Code § 5150.

Officer MacIntyre falsified his police narrative, and stated that I said to him that women were walking into me, before being handcuffed. I actually said this to him, for the first time, at the U.C.S.D. police station. This was after I had been handcuffed, and had been in the patrol car for about 40-60 minutes, and then taken to the U.C.S.D. police station.

I witnessed Officer MacIntyre, show up at the scene, talk to Briggs, then talk to me, then say he was arresting me. He said to me that he was arresting me; he did *not* say to me that he was

putting me into his patrol car for officer safety reasons. " I PLACED HANDCUFFS ON HIM AND PUT HIM IN THE BACK OF MY PATROL CAR FOR OFFICER SAFETY REASONS ". [ Ex 4; P 4 Middle Paragraph ].

I was examined ( refer to Section v. above; my eyes were examined with an eye measuring device ) by both Officer MacIntyre and Officer Rose for being on drugs, to try to find evidence to justify my having been illegally arrested. To try to cover up that I had been illegally arrested.

I was taken to County Mental Health ( "CMH" ) so as to cover up the fact that Officer MacIntyre had arrested me for a misdemeanor not committed in his presence ( a PC § 836(a)(1) violation ).

At CMH, a psychiatrist examined me, and did a urine drug test [ Ex 5; last page; negative results ], and determined that I was not " holdable by 5150 criteria ". [ Ex 5; Third page; Under "Treatment Plan". ]. Refer to Subsection x. below.

This taking of me to CMH was an unlawful violation of my personal liberty – a PC § 236 violation. Deceit was used ( a falsified police report ) and this made the PC § 236 a felony, punishable by imprisonment in the state prison, as per PC § 237(a).

### viii. <u>Egregiously Arbitrary and Discriminatory Police Processing: Police Investigation.</u>

At the police station, I, John Cobb, told both Officer MacIntyre and Officer Rose, what happened to me. I made the same statement to Dr. Bowlus ( the Psychiatrist, at the County Mental Health; "CMH" ). He subsequently wrote a report, which is herein included as Exhibit No. 5. But what I told the two police officers was not put into any of their reports – Exhibit No. 9.

At the U.C.S.D. police station, I volitionally, knowingly and intelligently spoke to the two U.C.S.D. Police Officers, and described Ms. Briggs attack and multiple batteries upon me. I spoke first to Officer MacIntyer, and later to Sgt. Rose. Sgt. Rose came into the room, and I said the same thing to him. I stated that Ms. Briggs approached me. ( I do not recall if I said that she approached me " three " times. But I did say, after kicking me, that she came after me and grabbed my backpack. ) That I was kicked multiple times by Briggs. I am positive that I showed both of these police officers Briggs' multiple foot marks, scuff marks, and foot prints on my white pants. At this time, I do not recall if I told them of feeling Briggs' finger scratch my face. Officer MacIntyr did put into his police report that I said that;

" I WAS JUST WALKING ALONG AND SHE INTENTIONALLY BLOCKED MY PATH ".

[ Ex 4; P 4; Bottom of Top Paragraph ].

This to me is an egregious violation of my Constitution Rights. No investigation was undertaken of the crimes committed by Briggs against me. No documentation and memorialization of the crimes committed by Briggs against me was made. No citation for battery was issued to Briggs for her batteries upon me. The police could have gone to where Ms. Briggs lived, they had her address, [ Refer to Ex 4; Police Report; Page 1 – " 9180 Regents Road; # B " ], and issued her a citation for the multiple batteries she committed upon me. At the police station, no photographs of Briggs footprints and shoe scuff marks were made of my white pants. However, at the police station, the two police officers did investigate me, and examine my eyes with some kind of a meter / device.

The U.C.S.D. police collected the statements of Briggs on two occasions, on 2-10-193, at the scene, and later on 4-19-1993, at the police station. The police collected the statements of four witnesses on 2-10-1993. Yet they did not document and memorialize my 2-10-1993 police station statement given ( knowingly and intelligently ) to two different U.C.S.D. police officers, one even being a police sergeant.

Further, failure to investigate, ignoring of exculpatory evidence, arbitrary investigation, and discriminatory investigation was under taken by the U.C.S.D. Police department, when, following my arraignment on 3-29-1993, and no charges having been initiated by the San Diego City Attorney's Office [ refer to Ex 3, bottom portion ], by having Briggs come back into the police department and make a " Victim Questionnaire ", dated and signed under penalty of perjury by Briggs on 4-19-1993. This goes to malicious investigation. This questionnaire was *accepted* by the City Attorney, and was produced to me, John Cobb, when I was acting as my own attorney, via discovery. [ Is included in Ex 9 – the People's Discovery ]. I was not asked by the U.C.S.D. police, or by the City Attorney, to make a statement of my own. Refer to Exhibit No. 9, People's Discovery.

An accusatory pleading was filed on 6-28-1993 by the City Attorney [ Ex 9; Last Page ]. Eventually, I plead not guilty at the arraignment on 8-12-1993 [ Refer to Exhibit No. 15; the 8-12-1993 dated court paperwork pink sheet ]. No accusatory pleading was ever filed by the City

of San Diego charging Briggs with the batteries she committed against me, or for any other crimes; e.g. perjury.

**ix. Disappearance of John Cobb's Police Statement.**

On 8-26-1993, I, John Cobb, went to the U.C.S.D. police department to make a written statement about what happened. I was given a different form [ Ex 8 ] from the form given to Ms. Briggs for her " Victim Questionnaire " [ Ex 6 ]. Compare Exhibits 8 and 6. Ms. Briggs form has specific questions on it. My from is just a blank piece of paper with lines on it. This is an equal protection violation to give me a different form than the form given to Ms. Briggs.

After the 11-15-1993 trial, on 12-15-1993, I telephoned the San Diego City Attorney's Office and inquired about the U.C.S.D. police statement I made at the U.C.S.D. police department on 8-26-1993 [ Exhibit No. 8 ]. My notes regarding this telephone call are herein included as Exhibit No. 18. I was told that they " couldn't find it ". This is a further equal protection and due process violation of my rights.

**x. Cobb Taken to County Mental Health**

**( Due Process Violation – No Probable Cause for U.C.S.D. Police to Take John Cobb to County Mental Health )**

On the date of the incident, when I went to the County Mental Health, I told what happened to the psychiatrist ( Dr. Bowlus ). He wrote this into a report, which is herein included as Exhibit No. 5.

Further, the report by Dr. Bowlus, basically says I ( John Cobb ) was " not holdable by 5150 criteria ". That " he [ added; John Cobb ] doesn't appear psychotic or even threatening to other people". He did not detect the presence of alcohol " no odor of alcohol "; and that I ( John Cobb ) was not suicidal, and was not "threatening". The drug test was negative for drugs. ( Included in Exhibit No. 5 ).

While at County Mental Health, an Hispanic looking female nurse, said to me that she ( Briggs ) was sick. She said people that do that king of thing are sick. She said this several times.

I was eventually discharged from county Mental Health, and they paid for a taxi cab to take me back to where my car was parked at U.C.S.D.

## C. Arraignment.

**( Briggs Has Back Injuries – Yes or No ? )**

I went to the first arraignment on 3-29-1993. Refer to Exhibit No. 3 ( actually is two items – the citation, and no charges filed document – the bottom portion). This shows a strip of paper ( I have the original of this ) that I was given at the court. This states that " no complaint has been filed ".

Following this, Briggs made a Victim Questionnaire, [ Exhibit No. 6 ], dated 4-19-1993. This contains a statement by Briggs that she had " Bodily Injury: Back injury, bruises, etc. ". [ Exhibit No. 6; " Victim Questionnaire "; Page 3. ]. However the police report, [ Exhibit No. 9; Page 2; under " VICTIM STATEMENT " ], states, " BRIGGS SAID SHE DID NOT THINK SHE SUFFERED ANY INJURIES AND DID NOT REQUEST ANY MEDICAL TREATMENT. "

Following this, I was sent a Complaint, dated 6-28-1993 [ O.C. Exhibit No. 6 ]. Following this, I attended arraignment on complaint, on 7-22-1993, which was continued [ Exhibit not included in either Original Complaint "O.C." nor " This Motion " T. M.", but can be provided. ]. Following this, I went to another arraignment on 8-12-1993, and plead not guilty [ Exhibit not included in either O.C. nor T. M., but can be provided. ].

At the actual trial / hearing ( on 11-15-1993 ), Ms. Briggs did not testify to, that she had any injuries. She was not asked by the prosecution ( or anybody else ) whether or not she had any injuries [ Briggs trial testimony; Exhibit No. 14; Pages 6-21 ].

After testifying, she was dismissed and excused as a witness:

> " JUDGE HAYES: DO YOU HAVE ANYTHING FURTHER OF THIS WITNESS ?
> MR. MARSHALL: NO.
> JUDGE HAYES: THEN, MAY SHE BE EXCUSED.
> MR. MARSHALL: NO OBJECTION.
> MS. WOODLEY: NOT YET TODAY, YOUR HONOR. BUT I WANT TO...
> JUDGE HAYES: ALL RIGHT. CALL YOUR NEXT WITNESS. ".
> [ Exhibit No. 14; P 21; L 16-24 ].

( There is a rule that says that a witness, after testifying, can wait in the hall, and be brought back, to testify again ).

Later at the 11-15-1993 hearing, U.C.S.D. Police Officer MacIntyre testifies. He testifies to that Ms. Briggs said on the date of the incident, 2-10-1993:

" BY MR. MARSHALL:

Q YOU TALKED TO MS. BRIGGS REGARDING HER INJURIES, DID YOU NOT ?

A YES.

Q. AND WHAT DID SHE INDICATE?

A I DON'T BELIEVE SHE SAID SHE HAD ANY INJURIES AT THE TIME.

[ Exhibit No. 14; P 37; L 5-10 ].

This is what Officer MacIntyre wrote in his police report. Refer to above, Page 19, Lines 24-26.

It is alleged by me, that following my first court appearance on 3-29-1993, and no charges having been filed, and then, later, on 4-19-1993, Ms. Briggs writing in her Victim Questionnaire that she had "back injury, bruises, etc.", that this *new* evidence of "back injury, bruises, etc." is the only reason that the prosecution was initiated. And the reason why I was ultimately convicted of a crime of battery.

There were no injuries, then there were injuries, then there were no injuries again. This is evidence that there was a conspiracy between Ms. Briggs and the San Diego City Attorney's Office. A conspiracy to cover up my ( John Cobb's ) illegal arrest, and subsequent chain of events which followed, etc. This was not brought out at the trial.

**i. <u>No Injury Testimony At Trial.</u>**

The chronology of injury evidence is as follows:

i. The police officer, MacIntyre, stated at trial, that Ms. Briggs said, on the date of the incident, that she had no injuries.

ii. After this, Ms. Briggs' written declaration under penalty of perjury states that she had back injuries and bruises.

iii. After this, Briggs' trail testimony gave no testimony about any injuries.

This is evidence that Ms. Briggs changed her statements regarding her injuries. Exculpatory evidence includes evidence going to the truthfulness of any witness. This injury discrepancy was

not brought out in the trail. Judge Hayes did say when pronouncing judgment, that Ms. Briggs was " very believable ".

**D. Pre-Trial Witness and Judge Belief Manipulation.**

**More White Female Events – Harassment and Orchestration.**

**Younger and Older White Male ( Judge ) Belief Manipulation.**

**i. Basic Situation and Facts**

With the original 2-10-1993 Briggs incident, the only yelling was me saying, " let go of my bag ", repeatedly, to Briggs, at the end of the incident. There was no kicking after this bag-pulling yelling ( this is what I know to be true ). The Police Report [ Exhibit No. 4; 3rd page in ], starts off by saying;

" ORIGIN . . .

AN R/P REPORTED THAT A MALE AND A FEMALE WERE STRUGGLING OVER A BACKPACK ".

This indicates that the witness ( the witness reporting the incident to the police ) only saw bag pulling, and reported such to the police.

However, the police report has the witnesses stating, that they heard ' SCREAMING FOR HELP "; and then saw kicking. [ Police Report, Exhibit No. 4; 3rd page in, under VICTIMS STATEMENT and WITNESS STATEMENTS ]. This, I know to be false – there was no kicking after any yelling. If the witnesses looked over at the yelling, they only saw bag pulling.

The following events that I experienced show an attempt to manipulate the beliefs of the incident male witness, and the beliefs of any Judge, or any character witness that I might obtain.

**ii. Pre-Trial Events Involving Younger White Males**

After arraignment, and before the trial, I started out conducting my own defense – in pro per. At various times, I would go to U.C.S.D. to use the internet in the libraries, and do research for my father's company S.S.T. ( Systems Services & Testing ). I would also go to a book store in the Costa Verde shopping center ( close to U.C.S.D.), and to a gas station near U.C.S.D. During certain of these trips, I experienced the following:

1.) On several occasions of this, a white, younger, college age, female, would walk into my path – like I had experienced in the past. However, on several occasions of this,

the white female would walk into my path, close to me, and then, rapidly, walk out of my path, doing this, and orchestrating this act, while close to a younger white male. She would be looking over at this younger white, college age male, with a critical expression on her face. This also occurred one time at a gas station, next to U.C.S.D., as I was getting gas for my car.

### iii. Older White Male and Judges' Beliefs Manipulation

2.) I had arranged for a friend who I had known since High School, Steve Allen Meloche, to be a character witness at my trial. I asked him to do this, and he agreed. Around this time, he told me that his father's brother was a Judge. This would be Judge Donald L. Meloche ( now Retired Judge, San Diego County ). Before this, I didn't know that his uncle was a Judge. This is talked about at the hearing between Steve Meloche ( character witness ) and Judge Hayes ( Trial Judge ). Refer to Trial Transcript; [ Exhibit No. 14, Page 3; Lines 7-25, and Page 4, Lines 1-21 ]. Page 4, Line 19; " THE WITNESS: HE'S MY UNCLE ".

Further, Former Judge Donald Meloche, served in the U.S. Marines. He went from Second Lieutenant to First Lieutenant, and served in the Korean War. Refer to Judges Profile, Exhibit No. 103.

Referring to Section ii above, I experienced the same type of thing, this walking into and out of my path, but on two or three occasions of this, it was orchestrated to be in front of an older, 50-70 years old, white male. ( One time was at the book store, in the Costa Verde shopping center, close to U.C.S.D. ).

These older white male events, could have been because of my character witness's uncle being a judge. And due to the fact that there was going to be a trail before a judge ( eventually Judge Hayes ), as opposed to a trail by jury. It could further be due to the fact that Judge Judith Hayes ( the Judge at my trial ), was married to Judge Charles Hayes the man. And, that the white female network, thought that I might be in cahoots with the judges, via my friend's uncle being a judge himself. Refer to Judges Profiles, Exhibit No. 103. It could also mean that the Hayes or Meloches lived around U.C.S.D., and this is why the white females were trying to manipule the beliefs of older white males in the U.C.S.D. area.

### iv. Theory and Explanation

These events are believed by me to be an attempt to manipulate the beliefs of the younger male incident witnesses, and also older white males, about the situation, and specifically Judge Meloche's beliefs, and eventually Judge Hayes beliefs. And / or, to manipulate the beliefs of my character witness, Steve Meloche. Specifically, that the incident witnesses didn't see what happened before the yelling at the bag pulling. And that, these white females are trying to establish, that, John Cobb doesn't move out of anybody's way, and that this is specifically what happened with the Briggs situation, that I didn't move out of her way.

It is also alleged, that these white females were police officer / personnel related. And that their attempts at the manipulations of any trail witnesses, was to cover up the fact that I had been illegally arrested by U.C.S.D. Officer MacIntyre. That Officer MacIntyre did not see me commit the alleged battery upon on Ms. Briggs in his presence; as required by PC § 836(a)(1).

This would be further confirmed by one white female, at U.C.S.D., who said verbally to me in passing, that I was going to go to " prison ". Prison, being for a felonious battery and a police officer can arrest someone for a felony not committed in his / her presence.

**v. <u>Threat of Going To Prison.</u>**

3.) Another pre-trial event occurred on the U.C.S.D. Campus. An anonymous ( to me ) younger, white female, stated to me that I was going to go to " prison ". Note also, that Briggs ( as in the brig ), is a military term for jail or prison.

**E. <u>Trial</u>**

Eventually, I obtained the services of an attorney, Thomas Marshall, on 10-14-1993 [ Exhibit No. 12. ]. Up until this, I had been acting as my own attorney – in pro per. I did this primarily because I didn't not know how to question witnesses and conduct a trial, and I didn't want to talk to Briggs.

**i. <u>Trial by Jury to Trial by Judge</u>**

The court paperwork ( pink sheets ) are herein include as Exhibit No. 15, Part 1.). These show that up until 9-13-1993, there was a jury trial scheduled for 10-18-1993. Refer to;

1.) 8-12-1993 pink sheet [ Exhibit No. 15; Part 1.) ]. States;

" DEFENDANT PLEADS: . . . NOT GUILTY . . . demands jury trial. "; and

2.) 9-13-1993 pink sheet [ Exhibit No. 15; Part 1.) ]. States;

" Jury Trial . . . date 10-18-1993 Time 8:15 a.m. ".

Following this, I retained the services of Atty. Thomas Marshall on 10-14-1993: [ Refer to Exhibit No. 12 ]. The trial / hearing was held on 11-15-1993. There was no jury. It was before Judge Judith Hayes. After retaining Thomas Marshal, I do not remember exactly how the case changed into a trial with a judge, from a trial before a jury. I thought at one point, for some reason, that a judge, being an attorney, would see the lies that were being told. I have a recollection of the jury voir doir concept being discussed with Atty. Marshal, and me answering that I was prepared to do it while I was acting as my own attorney.

**F. Prosecution Tricks Judge Hayes About The Evidence.**

**i. Inconsistent Testimony and Evidence, and**

**Verdict Found Contrary To Physical Evidence of Foot Prints on White Pants.**

Judge Hayes is a former Deputy Attorney General, Calif. State Department of Justice, a former assistant U.S. Attorney, and a former Deputy District Attorney. Refer to Judges Profiles; Exhibit No. 103. Prosecutor Beth Woodly misstates the evidence of witness Jamous. Refer to Section H. below.

At the 11-15-1993 trial, I was allowed to present my evidence of Briggs' foot prints and scuff marks on the white pants I was wearing on the 2-10-1993 incident. Refer to Trial Testimony, Transcript, Exhibit No. 14;

Page 54, Line 24-25;

" AND THEN SHE STARTED KICKING ME FROM STANDING UP ": Line 24-25.

Page 55, Line 1-25;

" IT'S RIGHT IN THE POLICE REPORT THAT SAID I WAS WEARING WHITE PANTS "; Line 3-4.

": SEE, THAT'S HER FOOTPRINT ( INDICATING ), AND THERE'S MORE FOOTPRINTS THERE ... "; Line 5-7.

Page 55, Line 1-25,

" . . . AND THEN SHE WAS ABLE TO KICK HIGHER UP. SEE, THERE'S MORE DIRT MARKS UP THERE AND IT GOT HIGHER. THERE'S ONE THAT HAS HER FOOTPRINT ON IT. ".

Page 56, Line 6.

" SEE, THERE'S HER HEEL PRINT THERE, ( INDICATING ) ".

Prosecuting Atty. Beth Woodley ( now Williams ) states; Page 60, Lines 17-19;

" THE VARIOUS WITNESSES SAW THE DEFENDANT KICKING BRIDGETT BRIGGS.
NONE OF THE WITNESSES SAW MS. BRIGGS KICKING THE DEFENDANT. ";

Atty. Woodley also states; Page 60, Line 11-12;

" ALL THREE OF THE WITNESSES TESTIFIED CONSISTENTLY. ".

However, they did not testify consistently as per the Police Report [ Ex 4 ] and Victim Questionnaire [ Ex 6 ]. Note that both of these documents were included in the People's Discovery [ Ex 9 ], provided to John Cobb, when he was conducting his own defense. But these two documents were not introduced as evidence at the trail. Refer to below discussion; in Section ii – Discrepancy In Statements.

Judge Hayes, in her pronouncing of judgment, states that Briggs' testimony is; " very believable ".

" AND I FIND, IN FACT, THAT HER TESTIMONY WAS VERY BELIEVABLE ".
[ Exhibit No. 14; Page 69; Line 13-14. ].

This was in spite of Briggs testifying that she did not kick me:

" Q AT SOME POINT IN THIS ALTERCATION, DID YOU KICK HIM ?
A NO. " [ Ex 14; P 18; L 4-5 ].

This, in spite of the inconsistent statement of Briggs, with regards to Esquierdo's testimony of her saying that she bumped into me ( John Cobb ) or that we bumped into one another;

" UH, I THINK SHE SAID THAT SHE WAS JUST WALKING AND BUMPED INTO HIM,
OF THEY BUMPED INTO EACH OTHER. ". [ Ex 14; P 27; 8-11 ]; and

" THE ONE WITNESS, MARK ESQUIERDO, DID TESTIFY IN CROSS-EXAMINATION
THE VICTIM TOLD HIM THAT SHE ACCIDENTALLY BUMPED INTO HI M, IT WAS
INCONSISTENT WITH HOW SHE TESTIFIED. ". [ Ex 14; P 61; L 18-21 ].

and Briggs denying that she said this;

"Q YOU HAD A CONERSATION WITH THE - - SOME OF THE BYSTANDERS
THAT ARRIVED LATER; CORRECT ?

A YES.

Q DID YOU RECALL TELLING ANY OF THEM THAT YOU ACCIDENTALLY RAN INTO MR. COBB?

A NO.

Q YOU NEVER TOLD –

A NO, I STATED I THOUGHT HE THOUGH THAT.

Q BUT, YOU NEVER TOLD ANYONE THAT YOU ACCIDENTALLY RAN INTO MR. COBB?

A NO. THAT IS NOT WHAT I SAID.

Q WELL, WHAT EXACTLY DID YOU SAY ?

A I BELIEVE THAT THE REASON THAT HE PUSHED ME THE WAY HE DID WAS THAT I WAS GOING TO KNOCK HIM DOWN.

Q THAT YOU WERE GOING TO BUMP INTO HIM DOWN ?

A YES. HE SAID SOMETHING TO THE EFFECT AS HE WAS KICKING ME, SOMETHING TO THE EFFECT OF, ' THAT'S WHAT YOU GET, BITCH, FOR CHARGING ME, " OF SOMETHING TO THAT EFFECT. THAT'S MY IMPRESSION, IT WAS LIKE HE . . .

MR. MARSHALL: NO FURTHER QUESTIONS. ". [ Ex 14; P19; L 9-25; and P 20; L 1-5 ].

In closing arguments, Defense Atty. Marshall does state that he established an inconsistent statement by Briggs:

Exhibit No. 14, Page 61, Line 18-21:

" THE ONE WITNESS, MARK ESQUIERDO, DID TESTIFY IN CROSS-EXAMINATION THE VICTIM TOLD HIM THAT SHE ACCIDENTALLY BUMPED INTO HIM. IT WAS INCONSISTENT WITH HOW SHE TESTIFIED. "

**ii. <u>Discrepancy In Statements When Considering Police Report and Victim Questionnaire</u>**

Refer to Exhibit No. 16; Titled:

PLAINTIFF'S **DECLARATION** REGARDING

CASE M-667177. ( ANALYSIS )

( GROUNDS FOR SUPPORT OF COLLATERAL ATTACK ON JUDGEMENT. NO RES JUDICATA. )

This Declaration was made by me, for case GIC 832227 – Cobb vs. Target. It points out multiple discrepancies in Briggs' and the witness's statements; between the police report, Briggs' Victim Questionnaire, and the testimony at trial.

These discrepancies were not brought out at the trail, as the police report and victim questionnaire were not entered into the trial evidence.

**G. Prosecution Woodley ( now Williams ) Makes False Statements About Evidence in Court**

The sequence of events was as follows; the Jamous incident happens, and then San Diego Police Officer Reschke makes a falsified police report about this incident ( falsifies that Jamous was pushed to the ground ). Then, the Briggs incident occurs, and then at the Briggs trial, Prosecutor Woodley repeats this falsified Reschke fact of Jamous being pushed to the ground, and then misstates the evidence again, by fabricating her own fact regarding Jamous – misstates the evidence that by saying that Jamous was kicked by John Cobb. Then Jamous testifies at the Briggs case hearing, and states that she was only pushed by John Cobb, and proves that Officer Reschke falsified and fabricated the fact that Jamous was pushed to the ground, and that Prosecutor Woodley falsified and fabricated the fact of Jamous being kicked.

Generally, on 9-19-1002, ( the previous case ) I elbowed / pushed Ms. Jamous, but did not push her to the ground, and did not kick her. Ms. Jamous testifies to this in the Briggs case trail. Jamous testifies that she was pushed but does not say that she was pushed to the ground, by me John Cobb, and does not say that she was kicked by me, John Cobb. Subsequently, San Diego Police Officer Reschke falsified his police report by two times saying that Ms. Jamous was pushed to the ground. Refer to <u>Chapter Section I, ( Previous Chapter ) John Cobb' Crimes ( Falsified Police Report of Officer Reschke).</u> Subsequent to this, during the Briggs case, Prosecutor Beth Woodley ( now Beth Williams ) fabricates evidence, misstates evidence not in the record, and falsely states that Ms. Jamous was kicked, as well as being pushed to the ground.

Prosecuting attorney, Beth Woodley ( now Beth Williams ), states in the hearing, that ; [ Exhibit No. 14; Page 60; Line 11-12 ].

" MS. WOODLEY: JUST BRIEFLY. ALL THREE OF THE WITNESSES TESTIFIED CONSISTENTLY. ".

The witnesses did not testify consistently with regards to the police report's record of what they said to the U.C.S.D. Police ( officer MacIntyre ). Refer to Section F. ii. above – **PLAINTIFF'S DECLARATION** REGARDING CASE M-66717. ( ANALYSIS ) [ Exhibit No. 16. ].

Prosecution Beth Woodley ( and my Defense Attorney Thomas Marshall ? ) would have had the police report before the trial. They could have cross-examined the witnesses on the stand. The witnesses could have been impeached.

**H. Trial Testimony and Prosecutorial Bias and Overreaching**

**[ Case of People v. Bolton 23 Cal.3d 208; Referring to Evidence Not in Record ]**

**i. Prosecution Commits Misconduct**

**by Altering Witness Jamous' Testimony.**

Specifically, Prosecuting Atty. Beth Woodley stated to Judge Hayes ( referring to Defendant John Cobb's previous battery upon Ms. Jamous );

[ O.C. Ex. No. 9: Page 38; Lines 17-25.]

**JUDGE HAYES:** PLACE YOUR OFFER OF PROOF ON THE RECORD, PLEASE.

**MS. WOODLEY:** THE PEOPLE ARE OFFERING IT FOR A LACK OF MISTAKE MOTIVE AND INTENT, AND VERY SPECIFICALLY WOULD LATER ALSO IT WOULD BE RELEVANT ON THE ISSUE OF - - BASED ON DEFENSE PUT INTO ISSUE AS BEING A VIOLENT, OR NON-VIOLENT PERSON, WHICH OPENS THE DOOR ON THAT CHARACTER TRAIT. SO IT WOULD CERTAINLY BE RELEVANT FOR THAT ALSO.

[O.C. Ex. No. 9: Page 39, Lines 9-16.]

**JUDGE HAYES:** YOUR OFFER OF PROOF AGAIN, MA'AM, WAS THAT THIS WITNESS WILL TESTIFY AS TO WHAT ?

" **MS. WOODLEY:** ALMOST IDENTICAL. THIS WITNESS WAS WALKING IN A PARKING LOT AND THE DEFENDANT, A STRANGER TO THE WITNESS, CAME UP AND PUSHED UP AGAINST HER. THE DEFENDANT SAID, YOU KNOW, " WHY DID YOU DO THAT ? " AND THE DEFENDANT STARTED

YELLING AND SCREAMING AND *PUSHED HER ON THE GROUND* AND *STARTED KICKING HER*. [ italics added ] "

Subsequently, Jamous testifies, but *does not* state anywhere that Defendant John Cobb pushed her on the ground, nor that Defendant John Cobb kicked her ( situation is not " ALMOST IDENTICAL " [ O.C. Ex. No. 9:_Page 39, line 11 ] ). Refer to Jamous testimony, O.C. Ex. No. 9: Page 41, Lines 21-25, and Page 42, Lines 1-14. Page 42, Lines 13-14; "A HE JUST KEPT PUSHING ME, AND PUSHING ME. I DON'T BELIEVE HE EVER KICKED ME, I CAN'T REMEMBER THAT."

Following this, when pronouncing her judgment, Judge Hayes has ignored Witness Jamous' testimony that she was not pushed down, and states; [ O.C. Ex. No. 9: Page 69, Lines 19-22 ];

" BUT, AT THIS POINT, THERE ARE AT LEAST TWO WOMEN WHO DON'T KNOW YOU, WHO DON'T KNOW EACH OTHER AS FAR AS I CAN SEE, WHO HAVE COME IN AND SAID THAT YOU KNOCKED THEM DOWN AND --- DON'T' INTERPRET ME, SIR. . . . "

Here, I was interrupting Judge Hayes to point out to her that Ms. Jamous had *not* stated that I pushed her down. But Judge Hayes states; " DON'T INTERPRET " [ added: This could be interrupt. ] ME, SIR.

The big picture of this, is that, there are three lawyers in the court room, 1.) Judge Hayes, 2.) Prosecution Attorney Beth Woodley ( last name now Williams ), and 3.) Defense Attorney Thomas Marshal. None of whom notice, or admit to noticing, the discrepancy in statements of fact between what Witness Jamous actually stated, and what Pros. Woodley and later Judge Hayes states that Witness Jamous says ( not pushed to the ground / pushed to the ground, and not kicked / kicked ). Judge Hayes has ruled based on Prosecutor Woodley's so-called testimony as a witness, not on the real witness Jamous' actual testimony.

**ii. <u>Relevance and Totality of Circumstances ( Discrimination ).</u>**

The relevance of this, is to establish a conspiracy to falsify evidence, involving Briggs and the witnesses Hansen, the U.C.S.D. police department, and the Prosecuting Attorney in the case; Beth Woodley Esquire ( City of San Diego City Attorneys. Suite 700 1200 Third Avenue San

Diego, California 92101. Currently Beth Williams is at the Law Office of Scott O'Mara; 2730 5th Ave., San Diego., CA. 92101. Refer to Exhibit No. 21 – Ms. Woodley has changed her name to Williams ).

**I. Results of Officer Reschke's Falsified Police Report.**

**Prosecutor Misconduct – Referring to Evidence Not In Record.**

**( Jamous Pushed to Ground and Kicked;**

**Prosecutor Woodley's Own Fabricated Fact of Kicking )**

At this Briggs trial, the prosecutor Beth Woodley, refers to falsified facts in Officer Reschke's police report. Pros. Woodley states to Judge Hayes that Ms. Jamous would testify to, that she was pushed to the ground. This was not so, as Ms. Jamous did *not* testify to being pushed to the ground. Prosecutor Ms. Woodley ( Williams ) states that;

> " The people are offering it for a lack of mistake motive and intent. . . .
> And very specifically . . . based on defense put into issue as being a violent or non-violent person, ". [ O.C. Ex. No. 9: Ex 14; P 38; L 19-24 ].

Further;

> Judge Hayes: " Your offer of proof again, ma'am, was that this witness will Testify to what ?". [ O.C. Ex. No. 9: Ex 14; P 39; L 9-10 ].
>
> Ms. Woodley ( Prosecutor ):
>
> " Almost identical. This witness was walking in a parking lot and the defendant, a stranger to the witness, came up and pushed up against her. The defendant [ added; probably witness] said, you know, " why did you do that ? " and the defendant started yelling and screaming and pushed her on the ground and started kicking her. ". [O.C. Ex. No. 9: Ex 14; P 39; L 11-16 ].

Prosecutor Beth Woodley has referred to evidence not in the record. She had said that Jamous would testify to being pushed to the ground, and to being kicked. But Jamous did not. Prosecutor Woodley has herself, fabricated the fact of Def. John Cobb kicking Jamous. Officer Reschke's own police report did not state that Jamous was kicked. Jamous herself testifies only to being pushed – *not* to being kicked and *not* to being pushed to the ground.

**J. Judge Hayes' Error;**

**( Believed To Be Non-Prejudicial Error.**

**Prevents John Cobb From Correcting Record, and Establishing That Officer Reschke Falsified Police Report, and that Prosecutor Woodley Misstates Evidence )**

But in spite of Ms. Jamous testimony, Judge Hayes, when pronouncing her judgment, falsely states that;

" two women . . . said that you knocked them down " [ Ex 14; P 69; L 19-22 ].

Witness Jamous did not testify to that she was knocked down. Further, I ( John Cobb ) then tried to tell Judge Hayes that Ms. Jamous did not say that she was knocked down, but Judge Hayes said; " don't' interrupt me, sir " [ Ex 14; P 69; L 22 ].

Judge Hayes introduces the concept of reasonableness, when she is pronouncing judgment;

" it is not reasonable " [ Ex 14; P 69; L 8];

and then goes on to say that Briggs' testimony is " very believable ";

" AND I FIND, IN FACT, THAT HER TESTIMONY WAS VERY BELIEVABLE "
[ Ex 14; P 69; L 13-14 ];

It is possible that the fact that Ms. Jamous was *not* knocked to the ground was never understood by Judge Hayes before pouncing sentence of guilty upon John Cobb.

There was no evidence of Defendant John Cobb making any inconsistent statements.

It is unknown whether Judge Hayes believed or didn't believe that Jamous was kicked ( Note; Jamous did not testify to being kicked, but Prosecutor Woodley said that she would. ).

**i. Later – At Sentencing.**

After the trial, Defendant John Cobb attended a ( believed to be ) sentencing hearing, before Judge Hayes. Def. John Cobb asked Judge Hayes, something equivalent to, could Ms. Briggs be prosecuted for battery against me ? ", and Judge Hayes said ( approximately ) " probably ".

**K. Analysis**

**i. ( Maliciousness and Abuse of Process )**

The Briggs case was replete with constitutional violations.

1.) Briggs' injuries: She didn't have ( no prosecution ), then had ( prosecution started ), and

then didn't have ( at trial ) injuries. Prosecutor Woodley referred to evidence not in the record ( Jamous pushed to the ground ), and even fabricated an untrue fact ( Jamous kicked ). This goes to maliciousness, and to abuse of process ( probable cause irrelevant ) and the use of the legal process for an unlawful objective.

2.) The unlawful objective being: To get a conviction, a conviction to cove-up and justify an illegal arrest, an illegal taking of defendant to CMH, and to cover-up; a discriminatory police investigation; Briggs batteries upon John Cobb; and an overall equal protection violation.

3.) The prosecution ( Woodley ) and the defense ( Marshall ), knew, or should have known, that the witnesses were testifying falsely – inconsistently with what was stated in the police report. This was not exposed at trial.

4.) At the hearing, that Jamous' testimony was different from what the Prosecution said it would be, was not brought out and stated specifically and explicitly.

5.) Judge Hayes ruled on *testimony* of Prosecutor Woodley, as if she were a witness, and not on the Witness Jamous' own testimony. E.g, Jamous pushed to the ground.

6.) A prosecutor fabricated fact was relied on by Judge Hayes ( Jamous pushed to the ground ) to falsely fabricate a motive ( lack of mistake motive and intent ) for the battery charge

From <u>[ People vs. Bolton; 23 Cal.3d 208 ]:</u>

> It is not necessary for bad faith to be shown to establish the existence of prosecutorial misconduct. For the purpose of deciding whether to reverse a decision or grant a mistrial, such emphasis on intentionally is misplaced. Injury to the defendant is nonetheless injury when it is committed inadvertently rather that internationally.

There are things called Rules of Professional Conduct, which include.

1.) The prosecutions first objective is to get at the truth, not to win cases.

2.) That if a lawyer thinks that their client is lying, they cannot question their client on the, stand but can have them do narrative.

### ii. <u>Statutory Violations – Police Officers and Witnesses.</u>

Officer MacIntyre's arrest of me, John Cobb, was a violation of PC § 836(a)(1) ( officer cannot arrest a person for a misdemeanor unless the misdemeanor is committed in the officer's

presence ). Officer Macintyre then falsified his police report narrative, a PC § 118.1 violation. Having my personal liberty unlawfully taken away is a PC § 236 violation, and when deceit ( defined as a false statement of fact ) is used, the false imprisonment in punishable as a felony as per PC § 237(a).

Assuming that the witnesses stated what was actually written into Officer MacIntyre's police report, this is a PC § 148.5 violation ( false report of a crime ), else it is a further PC § 118.1 violation by Officer MacIntyre.

**iii. Statutory Violations and Deceit by Prosecution.**

**( Business & Professions Code Violations; Cal. Rules of Prof Conduct. )**

It is a misdemeanor for any attorney to engage in any deceit or collusion, or to consent to any deceit or collusion intended to deceive the court. Bus & P. C. § 6128(a). This reads;

" 6128. Every attorney is guilty of a misdemeanor who either:

(a) Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party. ".

It is unethical for counsel to mislead a judge by artifice or by a false statement of fact or law. California Rules of Prof. Cond. 5-200 (A) & (B), Bus & P C § 6068(d). These read:

" Rule 5-200. Trial Conduct

In presenting a matter to a tribunal, a member:

(A) Shall employ, for the purpose of maintaining the causes confided to the member such means only as are consistent with truth;

(B) Shall not seek to mislead the judge, judicial officer, or jury by an artifice or false statement of fact or law; "; and

Bus & P C § 6068: " It is the duty of an attorney to do all of the following:

(d) To employ, for the purpose of maintaining the causes confided to him or her those means only as are consistent with truth, and never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law. ".

**iv. Facts**

Prosecuting Attorney Beth Woodley ( now Williams ) engaged in deceit and artifice before

Judge Hayes. She stated that Witness Jamous would testify to; that she was pushed to the ground and that she was kicked. Jamous testified to neither. Judge Hayes, when pronouncing judgment, then relied upon this false *evidence* of Prosecutor Beth Woodley, this false evidence being that Jamous was pushed to the ground.

**L. Sentencing**

**i. Conditions**

Exhibit No. 15, Part 3 ( the last three pages ), are the court's sentencing pink sheets. These include probation revocation for two prior cases, before the Briggs case. Summary probation was granted, with the imposition of sentence suspended for 3 ( three ) years. This would put the ending of the probation at 1-19-1997. Defendant John Cobb was also required to

> " Attend / complete COURT ORDERED PROGRAMS: . . . ongoing psychological counseling program at your [added; John Cobb's ] expense for 1 per week for duration of probation ".

Def. John Cobb was required to " RETURN TO Judge Hayes on 1-18-97, at 1:30 p.m., for a " review / further hearing re: Counseling Program ". I, John Cobb did not do this. I forgot about this. I also did not attend any psychological counseling. I could not afford any such counseling.

I was further restricted from leaving " San Diego County without the Probation Officer's consent ". I could " reside in " Virginia, Tennessee, Florida and California. ".

Exhibit No. 15, Part 4, is excerpts of the " SAN DIEGO COUNTY PROBATION DEPARTMENT ADULT SERVICES PROBATION OFFICER'S REPORT ". This contains the " ORDER GRANTING PROBATION ( PC 1203 )".

For the two prior battery cases probation was " extended 3 years from today ".

Several years after this, I, John Cobb, read in the law library, that the fine I got in this case, was the lowest fine for a misdemeanor. I also read, that the amount of the fine can be used to indicate the thinking of the judge.

**ii. Fourth Amendment Related**

I, John Cobb, was restricted in my travel, and required to " seek and maintain full-time employment, schooling or a full-time combination of the two ". I was further required to participate in ongoing psychological counseling, at my own expense, and continue this, once per week, for

three years.

**M. Constitutional Violations With Differing Types of Forms.**

**Firsts Come First Served Constitutional Violations.**

**Lost Statement of John Cobb.**

**i. Class Based Invidious Discrimination and Animus**

I was issued a citation for battery against Ms. Briggs. Ms. Briggs was not issued a citation for battery against me. This was discrimination. This was discrimination based on sex, sexual orientation, and based on who was a U.C.S.D. student, and who was not. When Ms. Briggs attacked me, she called me a " fag ", a usually derogatory term used for homosexuals.. [ O.C. Exhibit No. 9, Page 54, Line 19. Page 54 excerpt not included in either O.C. nor T.M, but can be provided. ].

It is also alleged that it was know to the U.C.S.D. police officers involved that I, John Cobb, am gay (a homosexual ). I started attending U.C.S.D. after graduation high school in 1977. Starting in the 1980's, I went to U.C.S.D. Lesbian and Gay Student Group meetings. I also went to a couple of these meeting in the early 1990's. I also had sex with multiple U.C.S.D. students.

I went to arraignment, and was given a piece of paper, saying that the charges had not been filed. Later, Ms. Briggs went to the U.C.S.D. police and made a " Victim Questionnaire "; dated 4-19-1993; O. C. Exhibit No. 4. Subsequently, a prosecution was initiated; dated 6-28-1993 – O.C. Exhibit No. 6. Following this, I, John Cobb went to the U.C.S.D. police and made a statement. This in O.C. Exhibit No. 7. I was given a different form than the form given to Ms. Briggs. Compare exhibits O.C. Ex. No.s 4 and 7. I was given a blank piece of paper, with lines on it. Ms. Briggs was given a Victim Questionnaire, which asked questions, and refers to a possible prosecution, and whether the victim could testify. Ms. Briggs signed this under penalty of perjury.

**ii. Arbitrary and Discriminatory Police Conduct.**

My statements to the two U.C.S.D. police officers about Ms. Briggs attacking me three times, kicking me, and scratching me, were never written into the U.C.S.D. police report. This is arbitrary and discriminatory police investigation of crimes. Further, Ms. Briggs and the witnesses false statements regarding the batteries allegedly committed by me, were written into the police report.

<u>Kingsland v City of Miami; 382 F.3d 1220:</u>

" An officer may not choose to ignore information which has been offered to him or her . . . Nor may the officer conduct an investigation in a bias fashion or elect not to obtain easily discoverable facts…".

Further, after exercising my first amendment right to free speech, and telling the U.C.S.D. police officers what Briggs had done to me, they acted with malice, and in retaliation and vindictiveness, and examined my eyes for evidence of drugs ( alcohol ), and then, upon finding no evidence, they said that I was mentally ill, and put me into County Mental Health.

Further, my being taken to County Mental Health by means of deceit ( unreasonable ) was felony false imprisonment – a felonious and unlawful seizure. These were violations of John Cobb's fourth amendment ( search and seizure ) rights.

This situation was a violation of equal protections of the laws. I was prosecuted and convicted of battery, while Ms. Briggs was not.

This situation was extremely distressing to me, causing me physical pain and severe emotional distress.

## II. DECLARATION OF JOHN COBB

**John Cobb Unlawfully Arrested at S.D.S.U.**

**( Date; 7-24-1997 ).**

**Malicious and Excessive Prosecution Follows.**

**( Original Complaint ( " O. C. " ) Exhibits No.s 13 - 24. )**

I, John Cobb, declare as follows:

### i. Preface and Synopsis

[ The original incident events are described more fully in my U.S. District Court Federal law suit, Declaration of Events, *not* herein included, but can be provided. This was file on June 24, 1999. Case No. '99 CV 1321 CGA. ].

Around June and July of 1997, I was enrolled in the S.D.S.U. Defense Conversion Program. I was also going to the S.D.S.U. Foundation to apply for jobs. I had done this several times before, as I was told to do by the S.D.S.U. Foundation employees themselves. On one of these occasions of seeking employment, a woman ( later identified as Sandra Nordahl ) deliberately looked at my chest: She did this while I was filling out task slips for jobs, and after giving instructions to Barbara Velez. She also was talking loudly, and this is what made me look up and over at her, upon which, she made eye contact with me, then looked at my chest area,, and the made eye contact with me again. I left, and went back to the Foundation to ask her about what she had done. When I returned Ms. Nordahl did the chest looking behavior a second time. ( I have fat around my chest area, and have had people deliberately looking at this for many years. ). I talked to her about what had occurred and left. At one point I said loudly, so that Ms. Nordahl could hear ( she had left and walked around a corner ), " discrimination is illegal ". These events are described in more detail in my 1999 U.S. Federal Lawsuit, not herein include ( but can be provided ), Case No. '99 CV 1321 CGA: Ex. No. 42, Declaration of Events, Pages3-6. The illegal arrest is described on pages 7-10.

### ii. Illegally Arrested For Having Exercised My First Amendment Rights.

On 7-24-1997, I was illegally arrested ( illegally seized – a PC § 236 violation ) by two S.D.S.U. Police Officers; a Sgt. Aaron Woodard ( a black male ); and a Sonny Cavarlez ( a Pilipino looking male ). They were called to the Foundation because I had been labeled as " confrontational " and " past disruptive behavior " by the female employee(s) of the Foundation. Following this, the two

police officers falsified two police reports, trying to cover-up the illegal arrest, and fabricate probable cause for the arrest. They falsely stated that I refused to identify myself, and refused to leave the building before being arrested. I was never told by either police officer to leave the building before being arrested. The arrest is describe more fully in my Federal Lawsuit declaration, [ Federal Lawsuit's 42's Exhibit No 20, Pages 7-10, Events of July 24, 1997. ], not herein included.

On 7-24-1997, I was sitting in a chair when the police were called. This is confirmed by Ms. Nordahl herself, as Jane Doe No. 1 ( Ex No. 34, Part 1. Restraining Order Declarations; Jane Doe No. 1 ), and from the 911 tape to the S.D.S.U. police made by Barbara Velez.

I then was falsely issued ( without probable cause ) a Citation for PC § 602(n) – being in a building not open to the public. ( It was later conceded by Prosecuting Atty. Kaye Meier that the Gateway Building (S.D.S.U. Foundation) was a building open to the public. She said to me; ( approx.) the people concede that the Gateway Building is a building open to the general public.). That there was a prosecution for Count No. 1 of PC § 602(n) with no probable cause, is malicious prosecution.

On the night of my arrest, I went to the law library to look up the Penal Code PC § 602(n). On the Thursday following my arrest, Michael J. Hickman obtained declarations from S.D.S.U. foundation employees for a restraining order ( "RO" ), to prevent me from contacting any S.D.S.U. Foundation Employees. In these restraining order declarations, Jane Doe No. 3 lied about what I did, and said that I became " combative ". This was never stated in any police report. The RO hearing was before Judge Thomas J. Whelan. He smiled at me when he first came into the court room. I would allege that this was to keep me from asking for another judge. He granted the RO, but stated in the court that I be allowed to walk around the outside of the building ( to buy parking permits at a ticket window on the side of the Gateway ( a.k.a.) Campanile Building ). But this allowed condition was never written into the RO that he signed. He subsequently signed an incorrect and illegal RO. The RO was the same as the temporary RO, which didn't say I could walk around the outside of the building. This RO prevented me from contacting any S.D.S.U. Foundation Employee. This RO was obtained, and obtained illegally, to pervert the course of justice, and to stop me from getting witnesses for my defense in the criminal matter (PC § 602(n)).

On 10-1-1997, the charges were amended to include as a second count a violation of MC §

52.80.01(a) [ Original Complaint; "O.C." Ex. No. 16. ]. This is further malicious prosecution, as there was no probable cause evidence to charge such a second count. I acted as my own attorney. On 10-6-1997, for discovery, I then provided a copy of the set of declarations taken for the restraining order [ Original Complaint ( "O.C. ") Ex. 17 is one of these. The others can be provided. ]. I obtained the 911-tape from the S.D.S.U. Police, and was given a tape with so much noise on it that I could only understand what was being said in a few places.

There was a criminal trial. On the first day of the criminal trial, opening statements were made by both sides before a jury ( I was acting as my own attorney ). That night, Ms. Kaye Meier telephoned me up and offered a plea to either;

1.) disturbing the peace loud and unreasonable noise:

( probable cause taken from the S.D.S.U. Police report. This report did not have probable cause for a fighting in public offer. ),

*or*

2.) disturbing the peace fighting in public:

( probable cause taken from Jane Doe No. 3's declaration for the restraining order; she said I, John Cobb was " combative "; this declaration under oath contains no probable cause for disturbing the peace noise. )

I understood that I had not done disturbing the peace fighting in public, and mistakenly and unknowingly accepted the disturbing the peace noise – loud and unreasonable noise. I did not realize that I had not violated the law, and that there was no probable cause for offering me a plea to, and for me to plead guilty to disturbing the peace noise.

[ Note; Legally, the most that Kay Meier could have offered me in plea bargaining, was a plea to disturbing the peace fighting in public. I would then have declined this. It is alleged by me that, the reason that I was not originally *charged* with disturbing the peace fighting in public, was that, this would have then directly brought into the cases, and made the case revolve around the issue of perjury ( by Jane Doe 3 – a PC § 118 violation ) versus, the two police officer's having falsified their police reports ( a PC § 118.1 violation ). ].

The two probable cause fact situations are mutually exclusive. They both can't be true. When I accepted the disturbing the peace noise plea and not the disturbing peace fighting in public plea,

Prosecutor Meier got a sour look on her face. This was the knowing use of perjured evidence to obtain a conviction. For the prosecution to use perjured testimony at a trial is a violation of the due process clause of the 14th Amendment of the U.S. Constitution.

To my knowledge, no charges of falsifying a police report were filed against either police officer, and no charge of perjury was brought against Jane Doe No. 3. This goes to an equal protection violation, and to discriminatory enforcement of the law

Prosecuting Atty. Meier suggested terms for sentence as: psychological counseling, then a reduction of the charge to an infraction, and " And the People submit, if the court wants to wave [ added; waive ] the fees and fine ? ".

I filed a U.S. Federal Lawsuit with regards to this situation on 6-24-1999. This is not herein included, but can be provided. I also filed a Habeas Corpus petition ( HC 16223; Filed on 2-18-2000 ), concerning the probation terms; fees & fines; and plea: This is also not herein included. Both were unsuccessful.

The probation fees and fines were run up to around $ 2,977.17, starting around the date of 2-11-1998, and ending around 3-11-2005. I received monthly bills for this entire time. This was ended by the county sending me a bill ( in April of 2005 ) for about $ 34.15 which I paid. Refer to O.C. Exhibits No. 24.

The specific details of these events are described more fully in my U.S. Federal lawsuit ( filed on 6-24-1999, not herein included ), at the back of this, as Exhibit No. 20 " Plaintiff's Declaration of Events "; and in my Habeas Corpus Petition ( filed on 2-18-2000, not herein included ), as Ex. No. 43.

The Habeas Corpus Petition contains transcripts ( As Ex. No. 1 ) of court proceedings for dates; 11-13-1997, 11-14-1997 ( excerpts included in Original Compliant, "O. C." Ex. No. 20. ); ( Trial and original plea bargain ); 12-19-1997 ( John Cobb placed in jail for ~ 30 days. Excerpts included in O.C. Ex. No. 22 ); and 1-15-1997 ( Sentencing ).

////

## A. Cover-up of Illegal Arrest

## ( Conspiracy Between City of San Diego and District Attorney;

## ( Malicious Prosecution by City and District Attorneys )

### i. Falsified Police Reports and Restraining Order Declaration

I was not told to leave the building before being arrested. I was illegally arrested by two S.D.S.U. Police Officers, one being a Sergeant ( It was actually the Sergeant that arrested me ). I was arrested while being in a building that was open to the public, and prosecuted ( charged as count No. 1 ) for being in a building not open to the public. [ John Cobb's Federal Lawsuit; Exhibit No. 5 – S.D.S.U. Citation for "602(n )", and O.C. Exhibit No. 16 – Accusatory Pleadings, and Amended Complaint: Charge of Count 2 of MC § 52.80.01 (a). Signed by Kenneth Davis, Deputy City Attorney. ]. I was arrested, put in hand cuffs, and taken to a cell at the S.D.S.U. Police Station. I was there issued a citation for PC § 602(n) – being in a building not open to the public. I was illegally issued a stay away order as per PC § 626.6, even though I was a student at S.D.S.U. [ O.C. Ex. No. 13 – John Cobb S.D.S.U. Student Identification Card ].

Sonny Cavarlez authored and falsified two police reports regarding the incident. These were approved and initialed by "AW" – Aaron Woodard. These are O.C. Exhibits No. 14 & 15. These police reports cover-up the illegality of my arrest. They falsely state facts for probable cause for any arrest. These are that I refused to identify myself, and refused to leave the building upon being told to do so. Further, a declaration by Jane Doe 3 was made which describes the same incident, but describes it differently. There were two cover-up stories and versions of the same incident.

**a. Version 1 – S.D.S.U. Police Officer Cavarlez Version**

[ Ex No. 31. " San Diego Regional Crime / Incident Report ". ]:

" R/P'S STATEMENTS ( BARBARA VELEZ )

VELEZ SAID THAT COBB WAS CONFRONTATIONAL WHEN HE WENT TO GATEWAY ON 7-14-97. VELEZ REQUESTED THAT COBB LEAVE THE AREA.

OFFICER'S ACTIONS / OBSERVATIONS:

I APPROACHED COBB AND REQUESTED FOR I.D. HE REFUSED. I ORDERED COBB TO ID HIMSELF. COBB BECAME AGITATED, SHOUTED AT US AND TOLD US WE DID NOT HAVE ANY LEGAL RIGHT TO CONTACT HIM. DISPATCH NOTIFIED US THAT COBB IS NOT AN SDSU STUDENT NOR AN EXTENDED STUDIES STUDENT. SGT. WOODARD REPEATEDLY ASKED COBB TO LEAVE. COBB REFUSED. I PLACED COBB UNDER ARREST PER 602(N)PC; REFUSING TO LEAVE, BASED ON HIS REFUSAL TO OBEY OUR LAWFUL ORDER, AND ON BEHALF OF FOUNDATION'S

REQUEST. I TRANSPORTED COBB TO OUR STATION WHERE I ISSUED HIM A MISDAMEANOR CITE. SGT. WOODARD ADVISED HIM OF 626.6PC,

[ Original Complaint ( "O.C." ); Ex. No. 15. " Incident Summary ". Dated 7-24-1997. ]:

" . . .I CONTACTED COBB AT THE 3RD FLOOR RECEPTION AREA. HE IMMEDIATELY BECAME AGITATED. I EXPLAINED TO HIM THAT HE NEEDED TO LEAVE THE BLDG. HE REFUSED REPEATEDLY. DISPATCH NOTIFIED ME <u>COBB</u> WAS NOT AN SDSU NOR AN EXT. STUDIES STUDENT. BASED ON THAT INFORMATION THE FACT COBB REFUSED TO OBEY MY LAWFUL ORDER TO LEAVE, I PLACED HIM UNDER ARREST FOR 602(n)PC; REFUSING TO LEAVE. I TRANSPORTED HIM TO THE STATION, ISSUED HIM A M/CITE AND ADVISED HIMOF 626,6PC.

ON 7-25-97 A 1315HRS SGT. WOODARD AND I CONTACTED COBB AT GATEWAY ON THE 4TH FLOOR. THE STAFF AND OTHER EMPLOYEES WERE AFRAID AND WORRIED AND CAUSED A DISSRUPTION OF THEIR BUSINESS. COBB WAS GIVEN A 'STAYAWAY ' LETTER FROM THE FOUNDATION DIRECTOR, BRENTS. ACTING ON THE WRITTEN & VERBAL NOTICE FROM THE FOUNDAITON SGT. WOODARD AND I ESCORTED COBB OUT OF THE BLDG. ".

[ Note I was also illegally issued a stay away order, as per PC § 626.6 – this applies to people who "person who is not a student ". I was a student in the Defense Conversion Program. Refer to O.C. Ex. No. 13 – Student Identification Card [ Note, this has been redacted, to remove my social security number, which was being used for identification purposes on the student ID cards. ].

**b. <u>Version 2 – Jane Doe 3 Version</u>**

On July 31, 1997, Jane Doe No. 3 ( in a restraining order declaration, made under oath ) wrote a differing version of what happened during the 7-24-1997 arrest. This is O.C. Ex. No. 17; " DECLARATION OF JANE DOE 3 ". She states: [ Paragraph No. 6 ].

" On July 24, 1997, . . .

I went to a desk down the hall and called 911. A few minutes later the campus police arrived. Mr. Cobb became combative and a second officer came for back-up. The officers handcuffed Mr. Cobb and, as they put him on the elevator, he continued to resist restraint. ".

From the two versions above, Prosecuting Atty. Kaye Meier offered me, a plea bargain to one

of either 1.) disturbing the peace noise, or 2.) disturbing the peace fighting in public. I understood that I had not done anything that would be disturbing the peace – fighting in public, or combative. As I pointed out in my Habeas Corpus Petition, the term " disturbing the peace – loud and unreasonable noise " was used in the court, and not the term " disturbing the peace – *willful malicious* loud and unreasonable noise ". I understood that I had not done anything which constituted " fighting in public ". However, I did not understand that I had not actually violated the law of disturbing the peace – *willful malicious* loud and unreasonable noise. My plea was therefore an involuntary and unknowing plea.

### ii. No Probable Cause

### ( Malicious, Retaliatory and Excessive Prosecution )

There was no probable cause to seize me, issue me a citation and to then prosecute me for PC § 602(n). I was in a building open to the public. A second count was charged, MC § 52.90.01(a), also without probable cause. These were prosecutions which were unlawful and without probable cause. This is malicious, retaliatory and excessive prosecution.

Regarding the plea bargain; there is no evidence of any kind, even from the S.D.S.U. police falsified police report, that I disturbed anybody. The description of me;

" COBB BECAME AGITATED, SHOUTED AT US AND TOLD US WE DID NOT HAVE ANY LEGAL RIGHT TO CONTACT HIM. ". [ Ex No. 31 ],

( even though not true ), did not disturb anybody. There is no evidence of me disturbing anybody, nor any employee, with my speech. There is no evidence of me using offensive words. My speech on this occasion was protected by the First Amendment to the Constitution of the United States. Prosecuting me for this exercise of my free speech rights goes to Retaliatory Prosecution.

The fact the I was charged three times, each time without probable cause for any of the charges, evidences malice on the part of prosecuting officials.

## B. Retaliatory Prosecution

The prima facie case for First Amendment retaliation is: (1) the plaintiff's conduct was constitutionally protected; and (2) the plaintiff's conduct was a " substantial factor " or " motivating factor " in the defendant's challenged actions [ Abrams v Walker 307 F.3d 650 ].

Where an officer attempts to punish a person for the exercise of First Amendment rights by filing a criminal charge against him, there is a potential cause of action under the Fourth and First

Amendments [ Jennings v Shuman, 567 F.2d 1213, 1219 ( 3d Cir, 1977 ). ].

In Hartman v. Moore [ 126 S. Ct. 1695 ], the Supreme Court held that a plaintiff in a retaliatory prosecution claim must plead and prove the absence of probable cause by the prosecution in order to have a cause of action. There was no probable cause to offer a plea to disturbing the peace – loud and unreasonable noise. There was no probable cause for a charge of PC § 602(n), and no probable cause for a charge of MC § 52.80.01(a).

i. <u>**Manipulation of John Cobb's Beliefs.**</u>

<u>**( Creating a False Impression Derived From Trial Opening Statements ).**</u>

The first day of trial, on 11-13-1997, before a jury, opening statements were made by both sides. These are not herein included, but are in John Cobb's Habeas Corpus Petition; as Exhibit No. 1, Trial Transcript of Proceedings: Pages 2-7. On Page 7, I, John Cobb, said to the Jury;

> " And so, but I don't have any problem with the restraining order. So I'm not here to change the restraining order ". [ Habeas Corpus' Exhibit No. 1; Page 7; Lines 17-18. ].

It is alleged by me, that Kay Meier, or somebody else; e.g. Ms. Meier's boss, when learning what I said at the trial opening statements ( that " I don't have any problem with the restraining order " ), decided to try to " put one over on me ", and make me the plea offer between the two disturbing the peace type charges. I understood that I hadn't done anything which would be " fighting in public ", and chose the " loud and unreasonable noise " plea. When I chose this loud and unreasonable noise offer, Ms. Meier got a sour look on her face – she didn't like it.

[ Note that, with regards to Ms. Kay Meier: O.C. Ex. No. 20 is a transcript of court proceedings that I paid a court reporter to make. The reporter has stated that Ms. Meier is a " Deputy District Attorney, and works for District Attorney Paul Pfingst. I telephoned up the City of San Diego City Attorney's Office with regards to this, and I was told that Ms. Meier worked at the San Diego City Attorney's Office. ]. However, in her opening statement to the jury, Atty. Meier stated that " I work with the City Attorney ". [ Ex 43; Ex No. 1, Transcript of Trial Proceedings; Page 2, Line 28. ].

ii. <u>**Further Manipulation of John Cobb's Beliefs**</u>

Further, around the time of this case, or soon after this case, I was going to the downtown San Diego law library. A man who worked there regularly ( I have know him to work at the downtown law library for many years ), who I believe to be named, Michael Kay ( or Kaye ), said to me in

passing, something equivalent to " lowering the bar ". I now assume this to mean that he thought that I had or would learn of the case law regarding disturbing the peace, and disturbing the peace loud and unreasonable noise. I didn't. I learned this distinct much later, around October of 1999, when I inadvertently found and read, In Re Brown case ( 9 C.3d 612; 108 Cal. Rptr. 465 ). At the time the case was on going, I assumed that I had violated the law, and that Prosecuting Attorney Meier had probable cause ( although I didn't think exactly in these terms ), to offer the plea to disturbing the peace noise.

When I realized this situation, I filed a Habeas Corpus Petition. This is not included herein, but can be provided. Was filed on 2-18-2000. These events are explained in more detail in this Habeas Corpus Petition. This was unsuccessful.

**iii. With Regards to Michael Hickman**

The illegal arrest occurred on a Thursday. The following Thursday, Atty. Michael Hickman ( of Musick, Peeler, and Garrett LLP ), took the depositions of 9 people for a restraining order, to stop me from contacting S.D.S.U. Foundation Employees. The criminal case accusatory pleading was amended to add as a count 2, a violation of MC § 52.80.01(a). Following this, I gave the City Attorney a copy of the set of the declarations taken for the restraining order.

Mr. Hickman was present in the court for the first day of the trial. When Judge Shore came into the court, Mr. Hickman stood up and announced his presence to the judge. When he did this Mr. Hickman looked scared looking.

At one time, when Judge Shore was not in the court, Atty. Hickman said to Atty. Meier ( the prosecution ), that the defendant, meaning myself, had an " O J. complex ". I believed this to be a reference to the O.J. Simpson murder trial, and to be a reference to my mother committing suicide in 1989, and that Mr. Hickman was saying to Atty. Meier that I had murdered my mother. I found this statement to be extremely offensive and hurtful.

Presumably, Atty. Hickman was trying to get Atty. Meier to keep prosecuting the case, and not to dismiss the charges. Atty. Meier did get a sour look on her face when I chose the noise plea instead the fighting in public plea. However, at one time I heard her talking, as in announcing something to the two S.D.S.U. Police Officers Woodard and Cavarlez, and when she did this, she called them " boys ". At the end of the 11-14-1997 proceedings ( plea bargain ), she did gesture, and put her hand onto my table, in a friendly and affectionate way.

### iv. Plea Bargaining on Non-Crimes Prohibited

Generally, the parties cannot enter into a plea bargain for acts that do not constitute crimes [ In re Crumpton ( 1973 ) 9 Cal. 3d 463, 106 Cal Rptr. 770. ( Habeas Corpus relief available ). Atty. Meier offered a plea to disturbing the peace noise, yet there was no probable cause for such an offer. This was also the knowing use of perjured testimony to secure a conviction. This violates the Bus & P Code, and the Cal. Rules of Prof Conduct.

## C. Judge Shopping, and Abuse of Process. Restraining Order and Thomas J. Whelan

Following my illegal arrest on Thursday, on the following Thursday, declarations were taken of S.D.S.U. Foundation employee for a restraining order ( " RO " ). This RO prohibited me from contacting any S.D.S.U. Foundation employees. This was done to obstruct justice. To prevent me from obtaining exculpatory evidence in my PC § 602(n) criminal trial defense. To prevent me and any S.D.S.U. Foundation employee, from constructing a defense.

The declarations for this RO are not herein included, except for that of Jane Doe No.3, as O.C. Ex. 17. My, John Cobb's, notes taken during the restraining order hearing, on August 18, 1997, before Judge Thomas J. Whelan are O.C. Ex. No. 18. ( A transcript will later be made of these 8-18-1997 proceedings ). The RO itself is O.C. Ex. No. 19. This unlawful restraining order was filed and issued to obstruct justice, and to prevent me, John Cobb, from obtaining exculpatory evidence ( evidence which hurts the prosecution or helps the defense ) for my defense.

Certain S.D.S.U. Employees lied about what I did. Especially, Jane Doe No. 3. She falsified her restraining order, and stated that I had " became combative ". Nothing like me becoming combative, was stated in the S.D.S.U. police reports [ O.C. Ex 14 and 15 ]. Refer to discussion above, **Section A i.**

I was illegally arrested by Sgt. Woodard on Thursday ( 7-24-1997 ), and was taken to a jail cell at the S.D.S.U. police station. Before being released, Sgt Woodard told me to stay off of the S.D.S.U. campus for a week ( PC § 626.6 ). I explained to him that I had class the following Tuesday. I showed Sgt. Woodard my matriculation paperwork for the Defense Conversion Program. I showed him my class schedule for the classes starting the following Tuesday. Sgt Woodard then told me to get a " note " which said that I was allowed to be on campus.

That Thursday night, I went to the law library and looked up the PC § 602(n) law ( trespassing; building not open to the public ). I then returned to the S.D.S.U. Foundation, the next day, to do three things:

1.) To get the note from Barbara Velez saying that I could be at the S.D.S.U. Foundation to look for jobs in the Navy Student Services Contract Module, as I had done several times previously: and

2.) To apply for work: On Thursday ( the day of my arrest ), I had seen a piece of cardboard placed onto the wall, next to the ground floor elevator door. It said that you could apply for jobs on the fourth floor of the Foundation. I was unemployed and looking for work, and I had intended to apply for these jobs. I actually did inquire about work on Friday ( 7-25-1997 ). This is corroborated by RO Declarant John Doe 1 [ Ex 34; Part No. 1 ]: and

3.) To get witnesses ( including Jane No 2 – Barbara Velez ) and other evidence for my defense in the PC § 602(n) trespassing criminal case, from the citation issued on 7-24-1997 by the S.D.S.U. Police.

**D. <u>Cover-Up and Obstruction of Justice</u>**

**<u>Abuse of Process.</u>**

**<u>Class Based Animus and Discrimination</u>**

On July 24, 1997, I was illegally arrested by two S.D.S.U. police officers. One was a police Sergeant. On the evening of the day of my arrest, I went to the law library to read the law of what I had been charged with, PC § 602(n). One day after this, on July 25, 1997, the S.D.S.U. Foundation's Legal Affairs Director, Juanita Brents, mailed me a letter prohibiting me from visiting the offices and communicating with employees ( except for Ms. Brents ) of the San Diego State Foundation. This is included herein in the Habeas Corpus document ( not here include ). I received this in the mail the following Saturday or Monday.

However, I met with Ms. Brents in her office on Friday, July 25, 1997. I went back to the Foundation to:

1.) get a note from Barbara Velez allowing me to be in the Foundation building ( I had been looking for jobs, and was told by Sgt. Woodard to get a note allowing me to be on the campus ): and

2.) look for work on the fourth floor of the Foundation Building: and

3.) establish that the Foundation Building was a building open to the public ( for my criminal trespass defense ).

On July 25, 1997, Ms. Brents called me into her office, and gave me a copy of the letter she had already mailed to me. She told me that I had to stay out of the foundation building. This is describe in the Restraining Order ( "RO" ) declarations of John Doe 1, and of Ms. Brents herself. During this meeting Ms. Brents stated to me that it could be arranged that I be removed from the S.D.S.U. Defense Conversion Program. She also told me that the building " was not open to the general public ". These events are described in more detail in my Federal Law Suit, not herein included, but can be provided, and specifically in this documents Declaration of Events; numbered pages 1-20, at the back.

It is alleged by me that, the Brents letter, the threat of removing me from the Defense Conversion Program, and the subsequent restraining order itself, were all done to prohibit me from obtaining witnesses and evidence for my PC § 602(n) criminal defense. That it was done to hinder my defense, to stop me from obtaining exculpatory witnesses, and to ultimately obtain my conviction. These series of acts constitute abuse of process.

### E. Judges and Judge Shopping:

#### i. Class Based Animus and Illegal Restraining Order

After my illegal arrest on 7-24-1997, and before the Restraining Order ( "RO ") hearing on 8-18-1997, I witnessed and heard a white female, in passing, while I was at S.D.S.U. stated to me that ( approximately ) " protestants were planting bombs in Northern Ireland ". This was the making of a connection and reference to my mother ( now deceased ), who was born in Northern Ireland, and was a protestant. And to me, being part Protestant Irish in ethnicity. My father was born in England.

Previously, on 7-25-1997, I had been making a sketch of the floor plan of the reception area of the fourth floor of the Foundation Building ( aka Gateway building ). I was doing this, because I had earlier that day, been told by Sgt. Woodard not to go to the third floor ( where I had been illegally arrested ) in the Foundation building. I was making the sketch so as to diagram that the building was indeed actually open to the public. And this would be used for my criminal defense in the upcoming PC § 602(n) trial.

This is referred to in the RO Declaration of John Doe 1. He states that;

" 2. On July 25, 1997, a co-worker identified to me as John Cobb a man sitting In the lobby of the fourth floor. .He was quietly drawing a floor plan of the elevator and lobby area, which contains some cubicle work stations. He then stood and was looking at signs and name plates and taking additional notes. . . . ".

[ From; Declaration of John Doe 1, not herein included, but can be provided. ].

Following this I attended the Restraining Order ( "RO " ) hearing on 8-18-1997 before Judge Thomas J. Whelan ( Currently at U.S. District Court – Southern ). Judge Whelan is a former District Attorney in San Diego, and I believe that Judge Whelan is an Irish Catholic – refer to Judges Profiles, Ex 103. When Judge Whelan first came into the court, he smiled at me. I would allege that he did this to stop me from asking for another Judge ( which I can do once without giving a reason, and did no do so).

Judge Whelan then asked me about the situation, and asked why he should not issue the restraining order. I said ( approximately ) that I was a student, and that I had / or needed to go to a ticket-window type widow at the side of the building to buy parking permits. ( the defense conversion program did not pay for parking permits, and I had previously gone to this window to buy a parking permit ). Judge Whelan then stated that I could walk around the outside of the building.

The restraining order was mailed to me after this hearing. This is included herein as the first two pages of O.C. Ex. No. 19. This " Order After Hearing " is signed by Judge Whelan. It is also signed by Y. Brennan. I would allege that both are ethnically Irish Catholic. This " Order After Hearing " specifies the same restraining conditions as the pre-hearing " Order to Show Cause and Temporary Restraining Order ". It does not specify the additional ability of; that I could " walk around the outside of the Foundation building ".

Immediately following this, I received in the mail, a parking permit. This exhibit is not herein included, but can be provided. I did not order and pay for this permit. Further, the permit specifies that I can park in " SP 800 and FS ". FS means faculty and staff. I was allowed to park in faculty and staff parking spaces. This is possibly an indication, that if I allow the PC § 602(n) conviction to succeed, that I would be given a job as " faculty and / or staff " at S.D.S.U.

Jane Doe 3 lied (" combative " ) in order to get the RO. The RO was obtained to obstruct justice, and to prevent me from contacting Foundation witnesses who could testify in my criminal defense. This substantially hindered my defense.

**ii. Trial – Pro Prosecution Judge.**

The trial was with a Jury, and the judge assigned was Judge Howard Shore. His judge's profile is included here in as O.C. Exhibit No. 49. This states that he is a former Deputy District Attorney in San Diego County. It further states, that Judge Shore is pro prosecution:

" Proclivities: Most of the other lawyers said Judge Shore frequently rules in favor of the prosecution. " He's conservative. Leans toward the prosecution. "

" [ He leans ] a little toward the prosecution. "

" He's incredibly pro-prosecution ." ".

**F. Remanded To Jail Without Bail.**

**Judge Shore Unlawfully Puts John Cobb Into Jail:**

**G. Remanded To Jail Without Bail.**

**Judge Shore Puts John Cobb Into Jail:**

**i. Violation of John Cobb's Due Process Rights**

Before conviction, bail is a matter of right, unless the offense is punishable by death, or a public safety exception is established. California Constitution art I, § 12. The " public safety exception ", allowing detention applies only to certain classes of felonies and to offenses in Pen Code § 292.

After conviction, a defendant in a misdemeanor case has the *right* to have a bail amount fixed that will cover the period between conviction and the pronouncement of judgment: Pen Code § 1272(1)-(2). I, John Cobb had plea guilty to a misdemeanor – PC § 415(2): disturbing the peace loud and unreasonable noise. PC § 1272 (1) and (2) read:

> 1272. After conviction of an offense not punishable with death, a defendant who has made application for probation or who has appealed may be admitted to bail:
> 1. As a matter of right, before judgment is pronounced pending application for probation in cases of misdemeanors, or when the appeal is from a judgment imposing a fine only.
> 2. As a matter of right, before judgment is pronounced pending application for probation in cases of misdemeanors, or when the appeal is from a judgment imposing imprisonment in cases of misdemeanors.

## ii. Violation of John Cobb's Due Process Rights

Before conviction, bail is a matter of right, unless the offense is punishable by death, or a public safety exception is established. California Constitution art I, § 12. The " public safety exception ", allowing detention applies only to certain classes of felonies and to offenses in Pen Code § 292.

After conviction, a defendant in a misdemeanor case has the *right* to have a bail amount fixed that will cover the period between conviction and the pronouncement of judgment: Pen Code § 1272(1)-(2). I, John Cobb had plea gûilty to a misdemeanor – PC § 415(2): disturbing the peace loud and unreasonable noise.

The proceeding of this 12-19-1997 remanding are herein included as O.C. Exhibit No. 23; Ex No. 1; Pages 15-19. This 12-19-1997 court date was originally set on 11-14-1997, as a Probation hearing.

" HEARINGS

(X) Readiness / Prob. Hrg. & Sent / (Prob. Hrg. & Sent.; is circled )

Date 12-19-1997

Time 9:00 AM ...

Dept. M-09 Room 2018 ".

During the 12-19-1997 proceedings, I told Judge Shore that on 12-5-1997, I entered the court building, and the detector did not beep; and then, a marshal insisted on searching my bag:

" . . . I walked through the gate and it didn't beep. ... and then they asked to search me ".

[ O.C. Ex. 22; Ex No. 1; Transcript of Trial Proceedings; Page 16; Lines 21-28 ].

Judge Shore then says;

" COURT: You know we do, we even do that to jurors. I mean, we don't there's no discrimination there. Everyone, if it beeps, everyone has to be searched. ".

[ O.C. Ex. 22; Ex. No. 1; Transcript of Trial Proceedings; Page 16; Line 29. Page 17; Line 1. ]

I then said to Judge Shore, a second time, that the detector *didn't beep*, and that the Marshall searched me anyway.

I further said that;

" I bumped into an attorney . . . they said it was an attorney, I didn't know it was an attorney ". [ O.C. Ex. No. 22; Page 17; Lines 6-11. ].

Later, during this 12-19-1997 proceeding [ O.C. Exhibit No. 22; Pages 15-19 ], Mr. Tom Nickel, acting for the prosecution, states that;

" the public safety has to be paramount, and obviously that's in our California Constitution, Article One, Section Twenty-Eight, that, in criminal matters public safety has to be the chief concern. Protection of the public. ".
[ O.C. Ex. 22; Page 17, Lines 25-28.].

I was then surprised by being remanded to custody by Judge Shore. I was in jail for about 30 days, and without bail ( 42 days in custody credits ). I was continually in jail until 1-15-1998. This was a violation of my constitutional right to have bail set. This was a violation of due process.

The 12-19-1997 Court Paperwork ( Pink Sheet, not herein included ), states and shows me being remanded to jail, by Judge Howard Shore, with no bail, on 12-19-1997:

" CUSTODY STATUS: (X) REMANDED ... / NO BAIL. ". ( NO BAIL is circled ).

Public safety concerns apply only to certain classes of felonies, and to offenses listed in Penal Code § 292. PC § 292 includes specific sex offenses with preventive detention scope ( PC §§; 261; 262; 264.1; 286; 288; 288a; and 289(a) ). None of these applied in my misdemeanor PC § 415(2) case. Further, I was not guilty and mistakenly and unknowingly plead guilty to something I did which was in fact not against the law.

**iii. Manipulation of John Cobb's Beliefs by Judge Shore.**

**Cover-Up of the Illegality of Situation**

The following quotes from O.C. Exhibits No. 21 and 22; Transcript of Proceedings; Proceedings Dated November 14, and December 19, 1997. Pages 8-19, 1997.

When a plea bargain was reached, ( a plea to a non-crime, unknowingly entered by defendant ) and when Judge Shore dismissed the jury, he stated to them that " I've seen this happen in a number of cases " [ Page 13; Lines 6 ]; and that " And that's what happened in this case, and its not unusual, its happened in a number of other cases " [ Page 13; Lines 12-13 ].

However, on December 19 Judge Shore reverses himself and states;

" And we were ready to go foreword with the Jury Trial, and the Defense decided to change plea, I think for me to properly evaluate what to do in a case like this, which is bizarre to say the least, I do need a psychiatric evaluation. ".
[ Page 18; Lines 11-13 ].

I was then placed into jail for a full 30 days ( 42 days custody credits ), unconstitutionally denied bail, and repeatedly denied ½ time release for good behavior.

I had been illegally arrested. I was arrested for being in a building open to the public – and it took the state 4 months to concede this. I was arrested without probable cause. I was prosecuted using perjured evidence. There was no probable cause for the charge and guilty plea to disturbing the peace. Judge Shore states after accepting a plea to a non-crime, that *my* behavior was bizarre. He is saying that my behavior is bizarre, when in fact, it is the behavior of the state which is bizarre, illegal, not reasonable, and not protected by qualified immunity:

" (2) officer's mistake in arresting citizen was not reasonable, and thus, was not protected by qualified immunity. ". [ Resek v. City of Huntington Beach; 41 Fed. Appx. 57. ].

**iv. <u>Events While in Jail</u>**

**<u>( Trying to Murder Me. ? )</u>**

I was in jail from 12-19-1997 until 1-15-1998. Two times, I asked at the jail about ½ time release, but was denied. I received 42 days of custody credits. Refer to O.C. Ex. No. 23; Page 1; 1-15-1998 dated pink sheet. ( " CUSTODY: Count 1 SERVE 42 days in custody of Sheriff".

While in jail, I petitioned two times for release, and was denied. This is described in my Habeas Corpus Petition, not herein included. [ Habeas Corpus Petition; Description of Events; " EVENTS WHILE IN JAIL "; Page 19-21. ].

While in Jail, I was punched by a Hispanic-looking inmate, who was being directed to do this by another Hispanic inmate. I told the jailer, and was transferred to another floor and then to another jail. When I first got to this new jail cell, I heard some other inmates saying that they didn't like "snitches". There was one inmate who was in jail for violent assault / felonies. When this violent felony / assault inmate would go to the shower, my cell door would open up as well as his ( Chains at the top of the cell doors, had been rigged so that both cell doors would open. Both doors did not open when I went for a shower ), and this violent felon would then walk across in front of my open jail cell door. Other inmates' doors didn't open up when I went for a shower.

**v. <u>John Cobb's Father Retains Attorney – Ira Lee Plummer.</u>**

While I was in jail, my Father obtained a lawyer, Ira Lee Plummer. He represented me for the 1-15-1998 hearing. He said to me, ( approximately ) that I knew my case better than anybody else. This was not true. He did not tell me that I had plea bargained on a non-crime – that there

was no probable cause to plea bargain on a charge of disturbing the peace noise; willful, malicious, loud and unreasonable noise.

Mr. Plummer also did not tell me the rule against the knowing use of perjured testimony.

## H. Sentencing and Related

O.C. Ex. No. 23, is the sentencing order. It reads;

1.) 42 day to custody of sheriff, with credit for 28 days actual days and 14 PC 4019 days credits, for a total of 42 days.

2.) Fine of $ 100.00 and restitution of $ 100.00.

3.) Restitution can be further modified by the court if the victim reports a loss / further

4.) costs.

5.) Restitution will become a court order if unpaid at end of probation.

6.) A waiver of extradition.

7.) A 4th amendment waiver; submit to person, property, place of residence, vehicle, personal effects, to search at any time, with or without a warrant, and with or without reasonable cause. When required by probation officer or other law

8.) enforcement officer

. . .

9.) Report any change of address or employment to the probation officer and revenue & recovery within 72 hours.

10.) Obtain consent of P. O. before leaving San Diego county or written consent of the court

11.) Seek and maintain full-time employment, schooling or a full-time combination of the two.

12.) Follow such course of conduct as the probation office may prescribe.

11.) Obtain the consent of the P.O. before leaving San Diego County OR written consent of the San Diego Superior Court before moving to another state.

12.) Not poses a firearm.

13.) Attend and successfully complete anger management

14.) That he take mediation if and as prescribed by a physician

That he participate in ongoing psychological or psychiatric therapy directed the court of P.O. and not terminate without permission of P.O and therapist.

15.) Comply with curfew if directed by probations officer.

I did not attend any psychological or psychiatric therapy. I did complete an anger management course.

The probations fines started around 2-11-1998, and were $ 239.00. I received monthly bills, and these kept coming until around April of 2005. The bill rose to around $ 2,944.77. Then, a bill was sent for $ 34.17. I paid this and the bill thereafter stopped.

i. **Improper Fourth Amendment Waiver At Sentencing**

**( No Contraband / No Possession )**

For the 1-15-1998 sentencing hearing, I actually had a lawyer. My father obtained the lawyer while I was in jail ( Ira Lee Plummer ). My case did not involve contraband. There was no " possession ".

I have a copy of a book from the law library ( title and library number ); " Action Guide; KFC 1025 . Z9 A43 2004. " It states, on page 69:

" WHEN PROBATION CONDITION INVALID

A condition of probation is invalid when it . . .

a. Does not serve the statutory purposes of probation.

Example Is Search condition was invalid because crime of conviction ( gambling ) did not involve contraband. People v. Mayers ( 1980 ) 110 Cal. App.3d 809, 816, 168 CR 252.

From the case of People v. Mayers ( 1980 ) 110 Cal. App. 3d 809:

" The court further held the search and seizure condition of probation was not reasonably related to defendant's offense of being a shill in a game of three-card monte. "; and

" (3) [T]he condition of probation must be 'directly' or 'reasonably' related to the crime proved to have been committed; "; and " This crime in not a crime of possession. "

My crime, the crime I plead to, was disturbing the peace noise. Further, upon being searched by the police upon entering the court on 12-5-1997, they found nothing. This is described in the Habeas Corpus document ( not herein included, but can be provided ); Exhibit No. 3; first page; states; " After searching it and finding nothing they released him. "

Further, I have read and have a copy of a U.S. Supreme Court Case, in which the justices state that police officers are expected to put up with a certain amount of dislike ( term ? ) in doing their job. However, I can't find this case right now, and do not recall where to look for it in the law library.

From the case of The People vs. Terry Bravo: 43 Cal.3d 600:

" The Supreme Court reversed the judgment of the Court of Appeal, holding that, although a waiver of rights under U.S. Const., 4th Amend., as a condition of probation, does not permit searches undertaken for harassment or searches for arbitrary or capricious reasons, . . "

Arbitrary, is defined in the American Heritage Dictionary:

1.) Determined by whim or caprice.

2.) Based on or subject to individual judgment or discretion.

3.) Established by a court or judge, rather that by a specific law or statute.

4.) Not limited by law; absolute; despotic.

I was subjected to an arbitrary and discriminatory search on 12-5-1997. I went to court on 12-19-1997, and with advanced notice to me, from there was placed in jail by Judge Howard Shore. The proceedings for this 12-19-1997 court appearance are transcribed in O. C. Exhibit No. 22; Habeas Corpus; Exhibit No. 1; Pages 15-19. Subsequently, at sentencing on 1-15-1997, I was give probation terms of a fourth amendment waiver ( search waiver ).

### ii. San Diego Police Searches Following Sentencing

Following my sentencing on 1-15-1998, I had 2 or so police contacts of a certain pattern – my car was searched. I was stopped, and I would give my identification to the police officer. The police officer would do the usual thing of ' looking me up ' ( ? ) in their data base.

They would learn that I had a 4th amendment waiver, and then ask me about it. The City of San Diego Police Officer would ask me why I had a fourth amendment waiver, and I would say; ( approximate ) a plea to disturbing the peace, to be reduced to an infraction. The police officer would then say ( approximate ); they don't give fourth amendment waivers for disturbing the peace. The police officer would then repeat the question; " why do you have a fourth amendment waiver ? ", and I would repeat what I had said, etc. This went back and forth several times.

I found these situations to be distressing because I considered it a possibility that a police officer could plant drugs, or something, in my car, and then falsely accuse me of having drugs. Note that in extending the Restraining Order, it is stated that I have been contacted by the S.D.S.U. police for " being drunk in public ". Refer to O.C. Ex. 29. This states that S.D.S.U. police have contacted me, John Cobb, for such things as " being drunk in public ". I just about never drink alcohol, and, to my knowledge, I have never been contacted by any police agency ( including S.D.S.U. ) for being drunk, or drunk in public.

## I. Perjury by Witnesses and Police, And, The Knowing Use of Perjured Testimony, and Deceit. ( Violations §§ P C 127; B & P 6068(d); B & P 6128(a) ).

Defense attorneys and prosecutors cannot allow witnesses to give perjured testimony. To do so may be a criminal violation ( Pen C § 127 – subornation of perjury ), as well as ethically improper. ( In re Branch (1969) 70 C2d 200, 210, 74 CR 238, 245, People v Davis (1957) 48 C2d 241, 257, 309 P2d 1, 10; Bus & P C § 6068(d)). Prosecuting attorney's must also disclose perjury committed by prosecution witnesses. Napue v Illinois (1959) 360 US 264, 269, 3 L Ed 2d 1217, 1221, 79 S Ct 1173, 1177.

An attorney cannot assist in presenting perjury or arguing perjured testimony to the court or jury ( People v Guzman ( 1988 ) 45 C3d 915, 941, 248 CR 467, 482 ). It is unethical for counsel to mislead a judge by artifice of by a false statement of fact of law: Cal Rules of Prof. Cond. 5-200 (B). Artifice is defined as; a clever plan or idea, especially one intended to deceive. Base deception or trickery. Deceit is defined as misrepresentation and deception, a trick, or falseness.

### i. Deceit by Prosecutor.

It is a misdemeanor for an attorney to engage in any deceit or collusion, or to consent to any deceit of collusion intended to deceive the court. Bus. & Prof. Code § 6128(a):

> " Every attorney is guilty of a misdemeanor who either:
>
> (a) Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party. "

This is what happened to me, as a party. I was deceived and tricked, by the Prosecution, Deputy District Attorney Meier, into thinking that I had violated the law ( via the plea offer to PC § 415(2) – noise ), when I actually had not violated the law.

After which, this was all ratified by Judge Shore, a former Deputy District Attorney in San Diego.

### ii. Discovery

On 7-24-1997, I was cited for PC § 602(n). On 10-1-1997, the City of San Diego City Attorney's Office ( Kenneth W. Davis, under Casey Gwinn ) amended the complaint to add as a second count, a charge of MC § 52.80.01(a); [ O.C. Ex. No. 16 ].

Following this, on 10-6-1997, I mailed the City of San Diego City Attorney's Office a copy of the set of the declarations, taken under oath, for the restraining order [ O.C. Ex. No. 17, is Jane Doe No. 3's Declaration ].

### iii. Contradictory Evidence

Jane Doe 3's declaration contains falsified facts. She states that I became " combative ", This, nor anything like this, is stated in either police report written by the S.D.S.U. police. Further, Jane Doe 3 states that I interacted with her on both the Thursday and the Friday. This is not true. I only interacted with her on the Friday ( the day after my illegal arrest ). On Thursday, I interacted with Jane Doe No. 2 – Barbara Velez. I had no interaction with Jane Doe 3 on Thursday.

On the arrest-Thursday, Barbara Velez gave me a white binder to look through for jobs. As I was being arrested by the two S.D.S.U. police officers, they started taking possession of my green binder, and of the white binder, as property. Ms. Velez then came over and took back possession of the Navy Student Services Contract Module's white binder. None of this was stated by Barbara Velez in her Restraining Order declaration. Ms. Velez ( Jane Doe No. 2 ) made no statement of any kind about what happened on the illegal arrest Thursday.

Further, this would explain why the City Attorney's Office and the black male City Attorney was opposed to my getting a non-redacted police report. A police report which states that Velez was at the Gateway on this Thursday, and met the police.

Further, I was given an inaudible 911 tape, from the S.D.S.U police. I couldn't' hear what was being said throughout most of the tape. However, I could hear Ms. Velez talking to Sgt. Woodard – I could recognize their voices.

### iv. Perjury and Use of Perjured Evidence.

Perjury is punishable in the state prison for 2, 3 or 4 years ( PC § 126 ). On 10-6-1997, by giving the people a copy of the declarations for the restraining order, I disclosed to the prosecution

the evidence of perjury ( PC § 118.1 ( police reports ) vs. PC § 118 ( RO declarations ), yet the prosecution continued.

For the prosecution to use perjured testimony at a trial is a violation of the due process clause of the 14th Amendment of the U.S. Constitution.

" An attorney who attempts to benefit his client through the use of perjured testimony may be subject to criminal prosecution " ( Pen Code § 127) as well as severe disciplinary action ( In re Jones, 208 Cal. 240, 242 [280 P. 964.). ".

The prosecution ( Deputy District Attorney, Kaye Meier, under District Attorney Paul Pfingst, as well as the San Diego City Attorney ) obtained such a benefit in this case, because by continuing with the charges, past the date of my giving a copy of the declarations to the prosecution, and exposing the two perjury camps, the prosecution obtained such a benefit for the prosecution's client, the people. They obtained a conviction.

## J. Alleged Quid Pro Quo

Police officer Sonny Cavarlez became a Sergeant ( I witnesses his stripes at a later contact ) and then a Lieutenant ( I witnesses his lieutenant bars and title when he was on television, regarding the opening of a trolley station at S.D.S.U. ). Sgt. Woodard's daughter was employed as a S.D.S.U. police officer. I was told this by another S.D.S.U. police officer. Casey Gwinn, (former San Diego City Attorney ) obtained a job at the District Attorney's Office. I read this on the internet.

The above payoff was in exchange for the perjured testimony: The fabricated police reports, the perjured testimony to be given at any trial, all to justify an illegal arrest by two police officers.

## K. State of California – Motive Is To Save Money.

Judge Shore is a former Deputy District Attorney here in San Diego County ( Refer to Judges Profiles, Ex 103 ). Upon the plea bargain being reached, Judge Shore stated the following when excusing the jury:

" So, although I'm sure its somewhat frustrating not to get to hear the evidence, I don't want you leave here thinking as though your duty here was a waste of time. Because on the contrary, you actually ended up saving the taxpayers a lot of money, by being here ready, willing and able to serve. ".

The Judge states that the arrived at case disposition " ended up saving the taxpayers a lot of money ". This evidences that the State's priorities are in saving money as opposed to protecting a citizen's constitutional rights. That the state is willing to convict an innocent person to save money – to save money in a possible later civil rights violation case.

## L. **Constitutional Violations**

There were substantial constitutional violations by many state officials in this S.D.S.U. situation. To begin with, the two police officers had a duty to know settled law. " In certain circumstances, government defendants have a duty to know settled, indisputable constitutional law. If they do not act in a manner consistent with settled law, they fail the objective part of the qualified immunity test as a matter of law. ". [ Wood v. Strickland; 420 U.S. 308 ( 1975 ). ].

I, John Cobb, was unlawfully and without probable cause, arrested for being in a building not open to the public, when if fact, the building was open to the public. I was illegally seized. This was a false imprisonment violation – PC § 236. My freedom was restrained when I was placed inside a jail cell. I was arrested for exercising my first amendment right to free speech. False police reports were made to cover-up this false arrest.

After my illegal arrest, the deep pockets of California's tax payers were dipped into, to hire an attorney to take restraining order declarations, to get a restraining order, and thereby hinder my criminal defense, and to provide false facts after the arrest, so as to justify the arrest.

Attorneys from the City of San Diego and the San Diego District Attorneys Office ( the State of California ), conspired to cover-up the illegality of the arrest, to get a conviction, and used perjured testimony to do so. They prosecuted three charges, all without probable cause. There was no evidence that I was in a building not open to the public, no evidence that I used a building for purposes contrary to its function or services, and no evidence that I disturbed the peace willfully and maliciously with loud and unreasonable noise. The fact that this was done three times evidences malice. This is malicious, retaliatory, and excessive prosecution. The state plea bargained on a non-crime. Trickery and deception was used in the court, to obtain this conviction. These were violations of Business and Professions Code Sections, Rules of Professional Conduct for attorneys, and case law. Attorneys are also required to know settled law.

I was unconstitutionally placed into jail without the right of bail, for 30 days. I was given severe

probation restrictions ( e.g. a 4th amendment search waiver, even though no contraband was involved in the case ). Then the probation bills were run up to about $ 3000.00, and were sent for a 7 year period. This was settled by me making a payment of $ 34.17 around 4-19-2005.

## III. DECLARATION OF JOHN COBB

## U.C.S.D. Filed Interview Report – Dated 2-5-1999.

## ( Exhibit No.s O. C. 26. and T. M. 3 )

I, John Cobb, declare as follows:

Around 6-9-1999, I received the U.C.S.D. Field Interview Report [ O.C. Ex. No. 26, third page ] inadvertently, from the City of San Diego City Attorney's Office, with regards to obtaining discovery regarding two traffic citations. This discovery is included herein as Exhibit No. O.C. 26.

### i. Field Interview Report by Officer Jones

Included with this traffic citation discovery was a "SAN DIEGO REGIONAL FILED INTERVIEW REPORT ", dated 2-5-1999; [ Refer to Exhibit No. O.C. 26; Page 3 ]. I did not know this existed until it came with the seat-belt discovery, around 6-9-1999. It was made by U.C.S.D. Police Officer " M. Jones, I.D. No. 602 ". Officer Michael Jones still works at U.C.S.D. ( as of 8-6-2007 ). He has new badge number, it is 650.

I do remember being contacted by Officer Jones in the food halls area of the price center. I think that I had been eating something. I cannot figure out what the " loitering " term means in relation to what I was doing at the price center. My only understanding at the time, was that, loitering, means waiting around.

### ii. False Accusations – No Reasonable Cause

The " FILED INTERVIEW REPORT " states;

" CRIME POTENTIAL

314.1PC / 647(A)PC ".

This " FILED INTERVIEW REPORT " further states under REMARKS;

" REMARKS ( REASON FOR CONTACT )

KNOWN VIOLENT

SEX OFFENDER LOITERING AT PRICE

CENTER. HOSTILE TO POLICE. C-37 I ".

This is a completely fabricated fact. I, John Cobb, am not a registered sex offender, and am not a violent registered sex offender. To my knowledge, I have never been in any

registered sex offender data base. I do not know what " HOSTILE TO POLICE. C-37 I " means, but I intent to find out thorough discovery.

PC § 314.1 is related to exposing one's private parts in public. PC § 647(A) is related to lewd conduct in public. I did not do anything like this, or anything which could be remotely construable as this. I was contacted by Officer Jones without any reasonable cause.

I found this Field Interview Report to be very offensive and distressing.

**iv. <u>U.C.S.D. Police Trying To Register John Cobb As A Sex Offender</u>**

From Exhibit No. ( This Motion's Exhibit's ) T.M. 3 is from the website of lawyer Bruce Nickerson. T. M. Ex. No. 3, on page 10 ( second for past page ), the Footnotes of Mr. Nickerson's Website, reads: Footnote " 4/ " states;

> " 4/ He also may have been arrested for a violation of PC 314.1, indecent exposure and/or 243.4(d)(1), sexual battery. These require special care because they contain the potential for sex registration pursuant of PC 290, which PC 647(a) and (d) do not. ".

PC § 314.1 reads;

> " 314. Every person who willfully and lewdly, either:
>
> 1. Exposes his person, or the private parts thereof, in any public place, or in any place where there are present other persons to be offended or annoyed thereby; or, "

PC § 290 reads;

> " 290. (a) (1) (A) Every person described in paragraph (2), for the rest of his or her life while residing in California, or while attending school or working in California, as described in subparagraph (G), shall be required to register with the chief of police of the city in which he or she is residing, or the sheriff of
>
> (2) The following persons shall be required to register Pursuant to paragraph (1):
> (A) Any person who, since July 1, 1944, has been or is hereafter convicted in any court ... subdivision 1 or 2 of Section 314,
> ... "

It is alleged that U.C.S.D. Police Officer Jones was on a fishing expedition – looking for evidence without any probable cause that a crime had been committed. He may have had a witness or witnesses, willing to make false statements about what I did. This is

what happened in the U.C.S.D. Briggs situation in 1993. Refer to Declaration and Analysis by John Cobb ( " Section " ), Section I.

That Officer Jones was trying to get a prosecution going against myself, John Cobb. That he was trying to use the absolute immunity of prosecutors to start a false and malicious crime prosecution against me, for PC §§ 314.1, or 647(a), or something else. And to use lying witnesses, etc. just like in 1993, with the Briggs situation – described in Section I. In this case, for example, Ms. Briggs committed perjury ( a felony ) and stated falsely that I rushed up to her. Refer to ( Original Complaint ) O.C. Exhibit No. 4.

### v. Unconstitutional Collection of Information

Further, Officer Jones has collected, and the report form has spaces for; my social security number, driver's license number, phone number, and birth date. This is information which is not supposed to be collected. It was unreasonable ( 4th amendment violation ) for him to collect this information.

I found in the law library one time, a bulletin which said that, the only information that a person is required to give to a police officer, is one's name an address. Presumably, on this occasion, I gave the additional information to Officer Jones volitionally.

### vi. Further Interaction with Officer Jones – Profiling

Further, in relation to Officer Jones. One time after this price center incident, I was leaving the U.C.S.D. book store, on the second level of the building. I walked past a table with two U.C.S.D. Police Officers sitting at it. One was Officer Jones. He was at a table with a Hispanic looking officer. As I walked past this table, Officer Jones pointed me out to this second Hispanic looking police officer, who then looked over at me. This is an incident in which I am being profiled by Office Jones.

### vii. Nexus Between U.C.S.D. and S.D.S.U. Police.

The dates and chronology of the events are as follows:

i. U.C.S.D. illegal arrest by U.C.S.D. police; Section I. Date 2-10-1993;

ii. S.D.S.U. illegal arrest by S.D.S.U. police; Section II. Date 7-24-1997;

iii. U.C.S.D. Filed Interview Report; Section III. Date 2-5-1999. (This Section );

iv. S.D.S.U. Restraining Order Extension. Section IV. Dated 9-12-2000;

v. U.C.S.D. Citation for PC § 647(d). Section V. Dated 2-3-2006.

For the U.C.S.D. Briggs Situation, Section I, I had a reporter make a transcript of the 11-15-1993 hearing. This is O.C. Exhibit No. 9 ( excerpts only, I can provide the complete transcript ). At the hearing Office MacIntyre, in referring to where he was employed as a police officer states;

> " The city of Escondido, Police Officer. And, prior to that, I was a police office for the State University Police at San ( Inaudible ) ". [ Trial Transcript, Page 33 ( not herein included ) , lines 12-14. ].

I listened to the tape and was able to determine, and it is my belief, that U.C.S.D. Officer MacIntyre stated that he worked at S.D.S.U. ( State University Police at " San Diego " ).

It is alleged that U.C.S.D. Officer MacIntyre's prior employment at S.D.S.U., is the nexus and connection between the cover-ups of the unlawful arrests, and the several incidents of harassment, based on sex, sexual orientation ( Sections; I, II, III, IV and V ), of me, John Cobb.

It is alleged that these police officers are conducting continuing harassment, and retaliation, and are on a continuing fishing expedition for malicious witnesses, as occurred in the 1993 U.C.S.D. Briggs situation ( Section I ).

## IV. DECLARATION OF JOHN COBB

**Extension of S.D.S.U. Restraining Order Extension**

**( Exhibit O. C. 29. )**

I, John Cobb, declare as follows:

Around September of 2000, the S.D.S.U. Foundation applied for an extension of the restraining order ( " RO " ) referred to in Declaration and Analysis of John Cobb ( " Section " ), Chapter Section II ( the S.D.S.U. Foundation illegal arrest by two S.D.S.U. police officers incident – July 24, 1997 ). The restraining order extension was extended to include the entire S.D.S.U. Campus.

The RO extension was based on falsified facts about me, John Cobb. These falsified facts included; not following the instructions of the S.D.S.U. Foundation employees and the S.D.S.U. police; being drunk in public; trespassing; looking under bathroom stalls; exposing himself for sexual encounters. Stating such facts in substantially upsetting to me.

### i. Nexus Between U.C.S.D. and S.D.S.U. Police.

The dates and chronology of the events are as follows:

i. U.C.S.D. illegal arrest by U.C.S.D. police; Section I. Date 2-10-1993;

ii. S.D.S.U. illegal arrest by S.D.S.U. police; Section II. Date 7-24-1997;

iii. U.C.S.D. Filed Interview Report; Section III. Date 2-5-1999;

iv. S.D.S.U. Restraining Order Extension; Section IV. Dated 9-12-2000. ( This Section );

v. U.C.S.D. Citation for PC § 647(d). Section V. Dated 2-3-2006.

For the U.C.S.D. Briggs Situation, Section I, I had a reporter make a transcript of the 11-15-1993 hearing. This is Exhibit No. 14. At the hearing Office MacIntyre, in referring to where he was employed as a police officer states;

> " The city of Escondido, Police Officer. And, prior to that, I was a police office for the State University Police at San ( Inaudible ) ". [ Ex. No. 14, Page 33, lines 12-14. ].

I listened to the tape and was able to determine, and it is my belief, that U.C.S.D. Officer MacIntyre stated that he worked at S.D.S.U. ( State University Police at " San Diego " ).

It is alleged that U.C.S.D. Officer MacIntyre's prior employment at S.D.S.U., is the nexus and connection between the cover-ups of the unlawful arrests, and the several incidents of

harassment, based on sex, sexual orientation ( Sections; I, III, IV, and V ), of me, John Cobb.

It is alleged that these U.C.S.D. and S.D.S.U. police officers are conducting continuing harassment, and retaliation, and are on a continuing fishing expedition for malicious witnesses, as occurred in the 1993 U.C.S.D. Briggs situation ( Section I ).

## V. DECLARATION OF JOHN COBB

**U.C.S.D. – Loitering Incident Dated 2-3-2006.**

**( Exhibits O. C. No. 38 – 47; and This Motion ("T.M.") No. 3 )**

I, John Cobb declare the following:

### i. Original and Starting Incident

On 2-3-2006, I went by bus to the U.C.S.D. Geisel Library. I took the bus because my car was being repaired ( I can prove this ). I got off the bus stop and started walking directly to the library. I went into a men's bathroom, which is directly between the bus stop, and the library, to go to the bathroom. This bathroom is now known to me as the first floor bathroom in Pepper Canyon Hall. As I was about to leave, and as I was standing up, I heard a noise to my right, and looked over to my right, and saw the top of a man's head. He looked over at me and said something like, " what are you looking at ? " , and I said excuse me. I then looked away. After which, I waited for a short time for safety, and then I left the bathroom.

I then sat on a bench outside of the bathroom to make sure that my laptop computer was secure. I carry it inside my backpack, and have it surrounded with towels so that it doesn't get damaged / broken. This took several minutes. I then started to walk to the Geisel Library.

### ii. Police Contact

**Illegal Search.**

As I was walking to the Geisel Library, I was contacted by U.C.S.D. Police. These two U.C.S.D. Police Officers were later identified to be Officer Reyes ( ID No. 606 ) and Gustafson ( ID No. 601 ). I got the name of Reyes from the citation. I tried to get their names and badge numbers during the stop, but they refused to give them to me. I got the name of Gustafson from the police report, when I eventually got the report. At one point, Officer Gustafson stated that a Sergeant Morris had showed up.

The two police officers asked me for identification and / or my driver's license. I said that I would give them only my name and address. Several things happened with regards to this:

- Officer Reyes insisted that I give him my driver's license. I started to get out my wallet, but then I remembered that I didn't have to give a police officer my driver's license. I told him this. [ One time I had gotten a handout from the San Diego Law Library, which said that the only thing that your required to do when a police officer contacts you, is to give them your name and address, and that you don't have to give them your driver's license. ]

- I told the police officers several times that I did not have to give them my driver's license.
- Officer Reyes insisted that I give him my driver's license.
- At one point, Officer Reyes grabbed the bus pass out of my front shirt pocket. I felt this. I would allege that he did this because it had a black stripe on the back, and he thought it was a driver's license – which also has a black stripe. I did not give him permission to do this.
- I gave them my name and address, and I believe that it was written down by one of the police officers.
- I asked them for their names and badge numbers, but they refused to give them to me.
- I said that I was going to take out a pen ( and paper ? ) to write down their badge numbers.
- I believe that Officer Reyes told me not to do this.
- I then started to take out a pen from the outside pocket of my backpack.
- Officer Reyes then grabbed me, and Officer Gustafson followed, moving slightly after Officer Reyes.
- They took me to the ground, rolled me over and handcuffed me. This scrapped my knee, and I showed this to them later. I also suffered a slight bruise to my hip.
- Officer Reyes then searched my backpack. I told him that he did not have permission to do that.
- Officer Reyes then took out my wallet, and my driver's license.
- The information of my driver's license number and birth-date on the citation and stay-away order has been illegally obtained.

One of the U.C.S.D. Officers talked to the dispatcher. I heard the dispatcher mention " 5150 ". Officers Reyes and Gustafson then went on to falsify the police report.

## iii. <u>Citation</u>

I was told by Officer Reyes that I was being issued a citation for " loitering ". This is confirmed by the police report:

> " I told COBB that he was being placed under private person's arrest for loitering in or about a public toilet per section 647(d) PC. ".

I remember him using the term "loitering ". He also used a term which referred to sex stuff. These are the terms which stuck in my mind, with regards to the situation as a whole.

## iv. <u>Unable to Obtain Police Report from U.C.S.D. Department.</u>

I was unable to obtain a police report from the U.C.S.D. Police Department. I telephone up the

department and asked how to obtain a police report. I was told to send a $ 6.00 money order. On 2-6-2006, I sent the money order, and a request for the report, but it was returned by the U.C.S.D. Police Department. I telephoned around ( Mary Garcia; Jay Dyer; Chief King ), and was told I couldn't get it. I called the City Attorney's Office, and was told that they didn't know why I couldn't get it from the U.C.S.D. Police. I did get the report, eventually, much later, from the public defender ( sometime after 6-29-2006 ). I had to ask them several times, and there was a delay in my getting the police report from the public defenders.

## v. What Is the Illegal Act ?

## How Do the Facts and the Laws Correlate and Meet-Up ?

## Involuntary and Unknowing Conviction ?.

The public defender, never explained to me how, that anything I did, was a violation of the law. This is still not clear to me. I cannot determine what the facts are which constitute a violation the law, and, even assuming the falsified police report is true, how the law elements that were violated relate to the facts of what I did. What did I do which violated the law, if any violation occurred at all.

### a. Statement of Victim / Witness – Mr. Cilingir.

The police report states that Mr. Cilingir's statement is the following:

" STATEMENTS:

Atila CILINGIR-Victim / Reporting Party

CILINGIR told me that COBB was in the bathroom and that he was in the stall next to COBB. CILINGIR told me that he was standing up with his clothing, pants and underwear pulled down and his genitals hanging out. CILINGIR told me he looked up and saw COBB looking at him over the bathroom stall wall. CILINGIR asked COBB what he was doing. CILINGIR told me that COBB mumbled something to him and continued looking at him. CILINGIR told me he felt very uncomfortable. CILINGIR then pulled up his pants and immediately left the bathroom. CILINGIR told me that he waited outside the restroom and followed COBB to the Price Center, he called the UCSD police department as he followed COBB. CILINGIR told me that he would like to place COBB under private person's arrest per 647 (d) PC. ".

[ Note, this statement does not contain probable cause for violations of any of PC § 647 (d) or (k)(1). ].

### b. With Relation to PC § 647 (d).

I was first issued a citation for PC § 647 (d). I cannot determine from police report statement of Mr.

Cilingir ( the R/P ) [ included herein as Exhibit No. 97: U.C.S.D. Police Report, and above ]., how that what he said that I did, violated the law of PC § 647 (d). To me, there is absolutely no reasonable suspicion, no probable cause, no facts of any kind, which can even remotely be construed as, having done something illegal as per PC § 647 (d). So then why did Officer Reyes write a citation for violation of PC § 647 (d).

Further, the only waiting is done by Mr. Cilingir himself;

" CILINGIR told me he waited outside the restroom and followed COBB to the Price Center ".

[ Line 13, above ].

"Loitering " means " to stand idly about, linger aimlessly ". The only evidence of this loitering is done by Mr. Cilingir himself.

The fact the Officer Reyes wrote the citation for PC § 647 (d), without there being any probable cause to write such a citation, shows bad faith. His writing of the citation is not reasonable. It implies that he knew that I was a homosexual.

I would further allege that he wrote a citation for this, in retaliation, and related to, police officer Jones, and the situation of the Field Interview Report written by Office Jones, on 2-5-1999. This mentions PC § 647. It is further alleged that he was directed to do this by Officer Sgt. Morris, who showed up on the scene.

### c. <u>With Relation to PC § 647 (k) (1) ( Now (j) (1) ).</u>

The charge was then changed to PC § 647 (k) (1). This reads;

"views, by means of any instrumentality, including, but not limited to, a periscope, telescope, binoculars, camera, motion picture camera, or camcorder, the interior of a bedroom, bathroom, ".

The police report does not say that I had any of these devices, or any instrumentality at all. So how could there be such a charge ?

The only thing that I did do, was to see the top of Mr. Cilingir's head above the top of the partition wall. But this is because I am tall, and Mr. Cilingir is tall enough, that we could see each other, over the top of this partition wall.

### vi. <u>Police Act Unreasonably To Obtain John Cobb' Drivers' License</u>

In this U.C.S.D. police interaction, the two U.C.S.D. police officers, acted unreasonably ( the fourth amendment standard ) to obtain John Cobb's drivers license. They have falsified their police reports and falsely state that I, John Cobb, refused to identify myself, and refused to give them any identification. This is not true. I only refused to give them my drivers' license. I did given them my name and address. I did this

because I had read a flyer / handout type document at the San Diego Law Library, which said that one was only required to state one's name and address, to a police officer.

Further, the two U.C.S.D. police officers have acted unreasonably in stopping John Cobb from writing down of their information – their names and badge numbers.

**vii. <u>Police Acting in Bad Faith and With Misconduct – Concealing Exculpatory Evidence.</u>**

It is alleged by me that the U.C.S.D. police officer ( J. Reyes, No. 606 ) has falsified the police report, and / or that Mr. Cilingir has altered his testimony and evidence, or both. That the evidence has changed, and that is why the prosecution changed the charge from <u>PC § 647 (d)</u> to <u>PC § 647 (k).</u> This is evidenced as follows:

My statement of the incident is described above in Section i; Lines 5-15. I looked away from Mr. Cilingir, but Reyes has written into the police report that " COBB mumbled something to him and continued looking at him " – this is not true. Either Officer Reyes has fabricated a solicitation; " COBB mumbled something to him and continued looking at him ", or Cilingir has. Officer Reyes then, without probable cause, wrote a citation for PC § 647 (d). The charge was changed to PC § 647 (k), when it was learned that the evidence had changed. This change in the evidence was not revealed to me by anybody, and allegedly not by any public defender.

**a. <u>Past Occurrences of Ratification By Public Defender.</u>**

I have had this situation occurred to me in the past, in the F-Street book store situation – <u>Section Not Included</u>. In this situation, I was in jail for five days ( unlawful seizure ), having been arrested by a San Diego police officer for being in a public building. During arraignment, a public defender stated to me that you can't expect a police officer to know what every law is on the books. This would be true, however, a police officer is required to know settled law, and to know what the law is that he or she is arresting me for ( in this case I was illegally arrested and put into jail for violation of PC § 602 (n), when in fact, I was in a building open to the public, and I told this to the police officer before I was arrested, and he arrested me anyway. ).

On this occasion, in the F-Street situation, I was lied to by the public defender, who said that the prosecution didn't have something, that was actually being used by the prosecution to deny me own recognizance release from jail - a past " failure to appear ".

This evidences that the public defenders priorities are not in the best interest of their clients.

**viii. <u>Allegation – That PC § 647 (k) (1) ( Now 647 § (j) (1) )</u>**

**<u>Is a Very Rarely Prosecuted Charge</u>**

It is alleged by me, John Cobb, that PC § 647(k)(1) is a very rarely prosecuted charge. I have looked in the law library, and there appears to be no case law for this PC § 647(k)(1) charge. This can indicate that there was prejudice and persecution. Def. John Cobb, has no information, and no way to determine if, like in the Darcy case ( People v. Darcy ( 1943 ) 59 C.A.2d 342 ), whether there are multiple police reports of PC § 647 (k) (1) violations, but that only Def. Cobb was prosecuted.

The protecting arm of the Fourteenth Amendment prohibits prosecutions based on prejudice and persecution. ( People v. Darcy ( 1943 ) 59 C.A.2d 342, 359 ). However, the Def. John Cobb's case was prosecuted as a infraction?

**ix. <u>Def. John Cobb Discovers A Case On 8-10-2007.</u>**

**<u>( People v. Soto 171 Cal. App. 3d 1158; 217 Cal. Rptr. 795. )</u>**

I recently ( on 8-10-2007 ) found the case of <u>People v. Soto</u>. This case describes exactly my situation in this U.C.S.D. PC § 647 case. The Soto case reads;

" **3. Lewdness**

Terms "lewd" and "lascivious" as used in West's.Ann.Penal Code § 647(d), prohibiting loitering for purpose of engaging in or soliciting any lewd or lascivious or unlawful act, are synonymous and refer to sexually motivated conduct, ...

In *Pryor* [ added; <u>Pryor vs. Municipal Court (1979), 25 Cal.3d 238</u> ], our state Supreme Court insulated section 647, subdivision (a) from a successful vagueness challenge by constructing it as follows: " The terms "lewd" and "dissolute" in this section are synonymous and refer to conduct which involved the touching of the genitals, buttocks, of female breast for the purpose of sexual arousal, gratification, annoyance or offense, ...

<u>Cal. Penal Code § 647(d)</u> is unconstitutionally vague in contravention of the due process clauses of Cal. Const. art. I, § 15 and U.S. Const. amend. XIV. ...

<u>Cal. Penal Code § 647(d)</u> violates Cal. Const. art. IV, § 16(a) which provides that all laws of a general nature have uniform operation. That provision does not tolerate a criminal law so lacking in definition that each defendant is left to the vagaries of individual judges and juries. ...

The prosecution then appealed the order of dismissal to the appellate department of the superior court pursuant to section 1466, subdivision 1(b) (currently § 1466, subd. (a)(2)). Said order was affirmed in an opinion certified for publication on the sole ground that section 647, subdivision (d) was unconstitutionally vague on its face because it encouraged arbitrary and discriminatory enforcement practices in violation of the Fourteenth Amendment to the United States Constitution.

. . .

We shall conclude that section 647, subdivision (d) on its face also encourages arbitrary and discriminatory enforcement and therefore does not comport with principles of due process. Because the language of section 647, subdivision (d) invites and promotes arbitrary and discriminatory enforcement of a penal statute, it does not conform to state or federal requirements of due process. (5) Before we may declare section 647, subdivision (d) to be unconstitutionally vague, we must determine if section 647, subdivision (d) can be interpreted to preserve its validity, for "[if] by fair and reasonable interpretation we can construe section 647, subdivision [(d)], to sustain its validity, we must adopt such interpretation . . . ." .

( Pryor v. Municipal Court, supra, 25 Cal.3d at p. 253.) ".

My U.C.S.D. situation is "vague" to me, and I am still not certain of what it is that the prosecution and the public defender are saying that was illegal about the situation, and anything that I did.

## x. The Definition of Lewd.

The case of Silva v Municipal Court for Oakland-Piedmont Jud. Dist., 40 Cal.App.3d 733, the court states; " **[8]** The lewd or dissolute or obscene conduct alluded to in Penal code section 647, subsection (a), concerns sexually related or motivated conduct, whether normal or perverted. ".

From the case of In re Smith, 7 Ca.3d 362 ( Supreme Court of California, 1972 ), ( a nude sunbathing case ):

" ... petitioner at no time had an erection or engaged in any activity directing attention to his genitals. ...

[3] From the foregoing definitions and cases the rule clearly emerges that a person does not expose his private parts "lewdly" within the meaning of section 314 unless his conduct is sexually motivated. Accordingly, a conviction of that offense requires proof beyond a reasonable doubt that the actor not only meant to expose himself, but intended by his conduct to direct public attention to his genitals for purposes of sexual arousal, gratification, or affront. fn. 4 . ...

It follows that on the undisputed facts of this case petitioner's conduct was not prohibited by The statute under which he was convicted. In such [ 7 Cal.3d 368 ] circumstances, he in entitled to the relief of habeas corpus. ".

Foot note No. 4 from this same Supreme Court case reads:

" **FN 4**. Wainwright v. Procunier (9th Cir. 1971) 446 F.2d 757, is in accord. There a Berkeley policeman on evening patrol observed the defendant urinate against the wall of an abandoned service station. When questioned, the defendant explained he had recently undergone surgery making it necessary for him to urinate frequently. No other persons were present but the defendant's own companions. The federal appellate court rejected the People's contention that the officer had probable cause to arrest the defendant for indecent exposure under section 314, subdivision 1. Emphasizing the sexual connotations of the requirement that the act be performed "lewdly," the court held the statute inapplicable as a matter of law to the defendant's conduct.

In this 2-3-2006 U.C.S.D. situation, there is no lewd conducted on the part of John Cobb, stated anywhere in the police report ( Ex. No. 42, Page 4, Statement of Atila Cilingir ).

### xi. With Regards to Appendix No. 1 and Appendix No. 2

Attached to this document are Appendix No. 1 and Appendix No. 2. Appendix No. 1 is a document titled;

" California Department of Justice – Criminal Justice Statistics Center,

**APPENDICES**

Data Characteristics and Known Limitations

Charges

Criminal Justice Glossary ".

This has links to the web site of the " CJSC Home Page ", and the " AG Home Page ". These 'California Criminal Justice Statics Center' and the 'California Attorney General' web links are shown in Appendix No. 2.

Page 2 of Appendix No. 1, states the following;

" **MISDAMEANOR LEVEL CHARGES**

**Lewd Conduct** – 647(a), 647(d), ... 647(k)(1), ".

Lewd conduct has been defined above in Section x.

### xii. In re Birch, 10 Cal.3d 314

My, Def. John Cobb's situation in this U.C.S.D. case is very similar to that in the case In re Birch, 10 Cal. 3d 314 ( Supreme Court of California (1973) ). In this case, a defendant was improperly advised by his attorney. Quoting from this case:

> " While petitioner possibly might have suspected that a guilty plea could result in a short jail sentence, we cannot believe that he was aware that as a consequence of urinating in a parking lot at 1:30 in the morning he would be required to register as a sex offender. Certainly counsel would have advised him of this grave and direct consequence of his guilty plea; in the absence of counsel the responsibility for such advice rested with the court. fn. 10 Without this advice, we conclude that petitioner's waiver of counsel and plea of guilty cannot be regarded as having been knowingly and intelligently made.
>
> Accordingly, petitioner is entitled to have his judgment of conviction set aside. (See In re Smiley (1967) 66 Cal.2d 606, 625 [58 Cal.Rptr. 579, 427 P.2d 179] and cases cited.)

### xiii. No Evidence of Viewing of R/P Cilingir's Nudity

Referring to Section x. and Section xi. above, and to reporting party Cilingir's statement in the police report ( Ex. No. 42, Page 4 ), I, John Cobb, do not think that I violated the law of PC § 647(k) (1). There is no lewd conduct, as required – refer to Section xi above.

There is no evidence that I looked upon, or tried to look upon Mr. Cilingir's nudity ( e.g. his genitalia ). There are no facts, and no evidence that any lewd conduct took place. It seems to me, that there should have been a demurrer ( or something ), as described in Exhibit No. T.M. No. 3. Refer to Section xiv. below.

### xiv. With Regard to Exhibit No. T.M. No. 3.

I have found the web site of Bruce Nickerson. He is an attorney that specializes in " lewd conduct issues relating to public cruising " [ Ex. No. T.M. 3, Page 1 ]. Ex. No. T.M. 3, Page 6, states;

> " if the allegation is he simply " loitered " around the bathroom and that is the only charge, you must file a demurrer of a motion in arrest of judgement, because there is no crime. Following my Caswell case, ( cited above ), I have never lost a " loitering " case that did not also include an allegation of actual sexual conduct. ".

Further, the Ex. No. T.M. 3 document, goes on to say that if the solicitation for sex does not state " where ", then file a demurrer or motion in arrest of judgement. " In the absence of any specific location, there is no evidence one way or the other that you client intended to perform the act in a public place … ".

In this John Cobb case, there was no evidence of any solicitation to have sex, nor solicitation to have sex in public. There was no lewd conduct. And no evidence that John Cobb looked upon, or tired to look upon, Mr. Cilingir's nudity or sex parts, ( e.g. genitalia ).

**xv. With Regards to John Cobb's Court Appearance on May 15, 2008.**

I, John Cobb made a court appearance in Dept. 48, on May 15, 2008, with regards to Case No. M 018229. During this hearing, appearing for the People, there were two lawyers;

i. Dan Rawlins ( # 246830 ); and

ii. Joseph Allen ( # 253302 ).

During this hearing, I asked Mr. Rawlins about the PC § 647(k) (1) statute, and he said, approximately, that it was an " enhancement, for an a, d, or i ". I have since read about enhancements at the law library. I have had no convictions or charges for any PC § 647 a, d, or i.

This PC § 647 ( k ) ( 1 ) ( now re-named ( j ) ( 1 ) ) is the charge which is on my record for the instant case situation – the situation that this Federal law suit is about. It was reduced to an infraction. Supposedly, it is an infraction enhancement.

During the case of M 992810 ( instant case PC § 647(d) / (k) case ), Plaintiff John Cobb entered a plea to an infraction of PC § 647(k)(1) ( now renumbered to PC § 647 (j) (1) ). Plaintiff John Cobb received a benefit in this plea bargain, in the form of a reduced charge in another case.

**xvi. Fishing Expedition**

I allege, that the U.C.S.D. police handled the situation in the way that they did, because they were on a fishing expedition, and were looking for evidence, including any falsified evidence, from any witness, which could be used to charge and convict me of PC § 647(d) ( or even PC § 314.1 – a sex register offense ).

This is the same type of situation which occurred previously, on two occasions, with the U.C.S.D. police. Refer to Declaration and Analysis of John Cobb ( " Section " ), Section I and Section III.

A similar situation occurred in the S.D.S.U. situation, Section II.

**VERIFICATION**

I declare under penalty of perjury under the laws of the State of California, and of the United States, that he foregoing is true and correct.

Dated: 5-20, 2008. Signed: ______________.

John Cobb – Plaintiff.

# Exhibit No. 1

TRIAL 9-16-93 8:10
220 W. BROADWAY S.D.

OFFICE OF
THE CITY ATTORNEY
CITY OF SAN DIEGO
John W. Witt
CITY ATTORNEY

SUSAN M. HEATH
SENIOR CHIEF DEPUTY CITY ATTORNEY
DAVID C. JAMES
ASSISTANT CHIEF DEPUTY CITY ATTORNEY

CRIMINAL DIVISION
1200 THIRD AVENUE, SUITE 700
SAN DIEGO, CALIFORNIA 92101-4106
TELEPHONE (619) 533-5500
FAX (619) 533-5505

**PLEASE CONSIDER THIS AS THE PEOPLE'S INFORMAL DISCOVERY ~~REQUEST PURSUANT TO PENAL CODE SECTIONS 1054.3(a) and 1054.3(b)~~ AND <u>IZAZAGA V. SUPERIOR COURT</u>, 54 Cal. 3d 356 (1991).**

The People hereby request discovery of the listed items that pertain to the attached case.

1. The names, addresses, and telephone numbers of any and all witnesses who the defendant intends to call to testify at trial.

2. Any and all written or recorded statements or other communications of witnesses who the defendant intends to call to testify at trial.

3. Any and all reports or statements of experts made in connection with the case which the defendant intends to use at trial.

4. Any and all results of physical or mental examinations, scientific tests, experiments, or comparisons which the defendant intends to offer in evidence at trial.

5. Any and all real evidence which the defendant intends to offer in evidence at trial.

Please notify me within five (5) days if you will not make these items available without a formal motion.

Sincerely yours,

JOHN W. WITT, City Attorney

By *Mary F. Foster*
Mary F. Foster
Discovery Legal Assistant

MFF:aag

# COUNTY OF SAN DIEGO

## DEPARTMENT OF HEALTH SERVICES

1700 Pacific Highway, San Diego, CA 92101
JAMES A. FORDE, Director

SMOKING ENDANGERS EVERYONE'S HEALTH

Mental Health Services
ADMITTANCE REQUEST

| | | |
|---|---|---|
| | Date: 2·10·93 | Time: 1930 |

From - Department: UNIV. OF CA. POLICE S.D

To: Mental Health Services

Name - Last: COBB

First: JOHN

Middle: HAROLD / ROBERT

Address - Street No.: 3955 MT. ALBERTINE WY

City: S.D.

County: S.D.

State: CA.

Zip Code No.: 92111

Date of Birth: 9·10·59

Telephone Number: 277-2026

Whom to Notify:

Relationship:

Address - Street No.:

City:

State:

Telephone Number:

Brought from

Jail [ ] Home [ ] Honor Camp [ ] Other ______

Jail Hold

Yes [ ] No [X]

Guard

Yes [ ] No [X]

Automobile

Yes [X] No [ ]

Make: CHRYSLER

Year: '87

License No.: UNK.

Location of car and keys (if applicable): TORREY PINES & L.J. VILLAGE / KEYS w/ SUBJECT

Reason for the Request

Mentally ill [X] Alcoholic [ ] Drugs [ ] Court Order [ ] Conservatorship [ ]

Comments:

Signature of ...

State of California—Health and Welfare Agency

Department of Mental Health

**APPLICATION FOR 72-HOUR DETENTION FOR EVALUATION AND TREATMENT**

*Confidential Client/Patient Information*
See California W & I Code Section 5328

MH 302 (Rev. 2/88)

W & I Code, Section 5157, requires that each person when first detained for psychiatric evaluation be given certain specific information orally, and a record be kept of the advisement by the evaluating facility.

☒ Advisement Complete ☐ Advisement Incomplete

Good Cause for Incomplete Advisement

Advisement Completed By: W.T. MACINTYRE #617

Position: POLICE OFC. #617

Date: 2-10-93

**DETAINMENT ADVISEMENT**

My name is ______

I am a (Peace Officer, etc.) with (Name of Agency).

You are not under criminal arrest, but I am taking you for examination by mental health professionals at (Name of Facility).

You will be told your rights by the mental health staff.

*If taken into custody at his or her residence, the person shall also be told the following information in substantially the following form:*

You may bring a few personal items with you which I will have to approve. You can make a phone call and/or leave a note to tell your friends and/or family where you have been taken.

To ______

Application is hereby made for the admission of JOHN HAROLD ROBERT COBB

residing at 3955 MT. ALBERTINE WY, California, for 72-hour treatment and evaluation pursuant to Section 5150, et seq., of the Welfare and Institutions Code.

• • • • • • • • • • •

The circumstances under which said person's condition was called to my attention are as follows:

COBB WAS DETAINED BY SEVERAL CITIZENS AFTER KICKING & STRIKING A FEMALE. WITNESSES STATE THE ATTACK WAS COMPLETELY UNPROVOKED

SEE REVERSE SIDE FOR DEFINITIONS

• • • • • • • • • • •

The following information has been established: (Please state with sufficient detail information to warrant the belief that the person for whom evaluation and treatment is sought is in fact a danger to others, a danger to himself, or gravely disabled.)

COBB SAID THAT VARIOUS WOMEN INTENTIONALLY CHALLENGE HIS INTEGRITY BY STARING HIM DOWN AND INTENTIONALLY WALKING INTO HIM. COBB IS ANGERED BY THEIR BEHAVIOR AND SOMETIMES LOSES CONTROL.

COBB HAS BEEN ARRESTED FOR SIMILAR OFFENSES IN PAST & BASED ON TODAYS INCIDENT I FEEL COBB MAY BE A DANGER TO OTHERS.

Based upon the above information it appears that there is probable cause to believe that said person is, as a result of mental disorder:

☐ A danger to himself. ☒ A danger to others. ☐ Gravely disabled.

Signature and title of peace officer, member of attending staff of evaluation facility or person designated by county: [signature]

Date: 2-10-93

Time: 1930

Phone: 534-4357

Address of Law Enforcement Agency or Facility: UNIV. OF CA. POLICE S.D. 9500 GILMAN DR. LA JOLLA CA. 92093

**Certication of Criminal Charges**
**(W & I) Code 5152.1, also 5152.2)**

If person is not accepted for admission or is detained for less than 72 hours, notification shall be made pursuant to W & I Code, Section 5152.1.

☐ Notification is requested as person has been referred under circumstances in which criminal charges might be filed.

Signature of Peace Officer

SEE REVERSE SIDE FOR INSTRUCTIONS

# Exhibit No. 2

Ex. 2

Chief Complaint
Condition of Others
History of Present Episode
Past Psych History

Medical History
Family History
Vital Signs
BP P T R

Mental Status Exam
Diagnostic Formulation:
All Five Axes
Assets

Treatment Plan
Discharge Criteria
Signature

CHIEF COMPLAINT: "I just pushed her down."

HISTORY OF PRESENT EPISODE: This 33 year-old, currently unemployed, single white male is brought for psychiatric evaluation by the University of California Police Department. The patient was on the campus at University of California San Diego this evening. He pushed a woman down who was walking on the sidewalk, who in turn scratched his face and kicked him and police were called because the woman felt he attacked her. Apparently there was no provocation for him pushing her down and because of some statements about his life-style and his dislike of women the officer brought him for psychiatric evaluation. Patient has no formal charges, though he does have apparently a misdemeanor charge filed. Patient states that while he was walking on campus this evening a woman bumped into him, "rudely" he then pushed her down and she fell into some bushes. She in turn attacked him, kicking him and scratching his face with her fingernails and apparently the two of them scuffled for a few minutes. The patient was then taken away by police and then brought here. The patient really has no other complaints. He is somewhat strange in interaction but he is not threatening. He doesn't appear to be intoxicated.

SOCIAL HISTORY: The patient graduated from University of California at San Diego in 1987 with a degree in Computer Science. He states he was recently laid off as an Engineering Consultant from a firm in La Jolla. Patient lives in Clairemont, he lives alone. Patient has few friends. The patient states he's homosexual but has few contacts with the gay community in San Diego because "I don't put out". The patient has no particular legal difficulties. Apparently he lives a rather isolated life-style. Patient is self supporting though he is out of work right now.

DRUG AND ALCOHOL HISTORY: The patient denies use of drugs or alcohol.

MEDICAL HISTORY: The patient is uncertain but he may be allergic to Penicillin. The patient has no serious ongoing medical problems or history of head trauma, takes no medication.

FAMILY HISTORY: Negative.

INSURANCE STATUS: None.

CONFIDENTIAL INFORMATION
DO NOT REPRODUCE
This information is protected under Ca... Institutions Code 5323. You are ... making further disclosure without ... written consent of the person ...

County of San Diego
Department of Health Services
Mental Health Services
SAN DIEGO COUNTY PSYCHIATRIC HOSPITAL
**PSYCHIATRIC ASSESSMENT**

DHS: MHS-204-A (5/92)

| | |
|---|---|
| PATIENT NAME: COBB, JOHN | |
| M.R. #: | UNIT: |
| DATE OF BIRTH: 9-10-59 | DATE: 2-10-93 |
| ASSESSED TIME From: 2045 To: 2130 | SECTION 2572: ☐ Yes ☑ No |

Chief Complaint
Complaint of Others
History of Present Episode
Past Psych History

Medical History
Family History
Vital Signs
BP P T R

Mental Status Exam
Diagnostic Formulation:
All Five Axes
Assets

Treatment Plan
Discharge Criteria
Signature

Page 2

VITAL SIGNS: Blood Pressure: 170/98 Temperature: 98.0 Pulse: 92
Respirations: 20.

MENTAL STATUS: The patient is a tall, overweight, 33 year-old man who appears his stated age. He is dressed in a pair of white jeans and a white T-shirt. Patient is cooperative and pleasant. He is without behavioral disturbance. He has no odor of alcohol and has no pressure or slurring of speech. The patient is oriented, memory is grossly intact, mood is dysphoric, affect is friendly. Thinking is reasonably goal directed without obvious psychotic symptoms. Denies paranoia, thought broadcasting, and auditory hallucinations. He has some vague ideas of reference regarding television programs about gay people in San Diego and how this somehow relates to him. Patient is not overtly psychotic and there is no particular thought disorder, though he has quality that is somewhat unusual. The patient denies any suicidal or homicidal ideation. Intellectual functioning is not impaired, insight and judgment adequate, in good control.

TREATMENT PLAN: At this point the patient really isn't holdable by 5150 criteria, he doesn't appear to be psychotic or even threatening to other people. It is unclear what his motivations for his behavior this evening. Patient will be asked to provide a urine drug screen assuming that he remains calm and cooperative he will be released to home.

LEE BOWLUS, M.D.
STAFF PSYCHIATRIST

DO NOT REPRODUCE
This information is protected under Co. Welfare & Institutions Code 5328. You are prohibited from making further disclosure without the written consent of the person to ...

LB:sm
D: 2-10-93
T: 2-10-93

2-10-93 2200 PSYCHIATRY
Pt remained calm, cooperative and with threatening or bizarre behavior. UDS NEGATIVE. Pt is not holdable by 5150 criteria and is released to home. Pt declines psychiatric referral.

L. Bowlus, MD

County of San Diego
Department of Health Services
Mental Health Services
SAN DIEGO COUNTY PSYCHIATRIC HOSPITAL
**PSYCHIATRIC ASSESSMENT**

| PATIENT NAME | |
|---|---|
| COBB, JOHN | |
| M.R.# | UNIT |
| DATE OF BIRTH 9-10-59 | DATE 2-10-93 |
| ASSESSED TIME From: 2045 To: 2130 | SECTION 2672 ☐ Yes ☐ No |

# LAB RESULTS SHEET

PATIENTS NAME: Cobb, Fox

CODES: (+)=POSITIVE (-)=NEGATIVE (N\T)=NOT TESTED (N/A)= NOT APPLICABLE

## ONTRAK

AMPHETAMINES: (–)

COCAINE: (–)

THC: (–)

MORPHINE: (–)

PCP: (–)

DATE & TIME 2/10/93 - 2115

PERFORMED BY: [signature] RN

CONFIRMED BY: [signature]

DR'S SIGNATURE/INITIALS [initials]

## MISCELLANEOUS

PREGNANCY:

ALCO SENSOR III (B.A.L.)

EXACTECH (BLOOD GLUCOSE)

OTHER:

DATE & TIME

PERFORMED BY:

CONFIRMED BY:

DR'S SIGNATURE/INITIALS

EPU\DA\91

# Exhibit No. 3

Case 3:08-cv-00188-JAH-WMC Document 25-3 Filed 05/22/2008 Page 87 of 103



*My focus is on lewd conduct issues relating to public cruising. I also concentrate on cruising on the internet, and possession of erotic materials including the use of computers.*

*I am devoted to the legal problems that Gays encounter because of their sexuality.*

LAW OFFICE OF
**Bruce W. Nickerson**

Main Page

Advice for Surfing the Internet

Who is Bruce Nickerson

Lewd Conduct Police Sting High Court Backs Gays

Double standards, falsehoods and ignorance of the law make Lewd Conduct Arrests Questionable

How to Safely Cruise in Public

Lewd Conduct Cases Primer for Attorneys

Links

Contact Information

**Read about Bruce Nickerson at Wikipedia**

## Lewd Conduct and Sex Crimes

Perhaps the leading authority in the area of criminal law pertaining to Lewd Conduct and Sex Crimes, Bruce Nickerson has handled over ONE THOUSAND cases throughout California from the Municipal Court Level to the California Supreme Court.




**Bill O'Reilly TV Interview**



Double Standards, Falsehoods and Ignorance of the Law make Lewd Conduct Arrests Questionable

High Court Backs Gays Against Police Sting

A special primer for attorneys re: lewd conduct cases



*My focus is on lewd conduct issues relating to public cruising. I also concentrate on cruising on the internet, and possession of erotic materials including the use of computers.*

*I am devoted to the legal problems that Gays encounter because of their sexuality.*

Main Page

Who is
Bruce Nickerson

Advice for Surfing the Internet

Lewd Conduct Police Sting
High Court Backs Gays

Double standards, falsehoods and ignorance of the law make
Lewd Conduct Arrests Questionable

How to Safely
Cruise in Public

Lewd Conduct Cases
Primer for Attorneys

Links

Contact
Information

# LAW OFFICE OF
# Bruce W. Nickerson

## Primer for Attorneys: Lew Conduct Cases

This primer is designed to introduce attorneys, particularly those in California, but also those in other jurisdictions, to the various ways that arrests made pursuant to police decoy sting operations may be defended. It is particularly relevant in states which have decriminalized sodomy laws, but where the police continue to make arrests under the various public sex i.e. vagrancy statutes.

In California, regardless of your criminal law background, you need to read this letter very carefully, because lewd conduct is absolutely the most misunderstood and mishandled "crime" in California Penal law.1/

First, please permit me present to you my qualifications to write this primer.

I am an attorney who for his entire career has focused and specialized in defending lewd conduct arrests, having personally handled over one thousand cases. More important, In 1988, I was one of the attorneys who argued People v. Superior Court ('Caswell), (1988) 46 Cal. 3rd 388, 758 P. 2d 1046 which held that in order to violate Penal Code

section 647(d), a person must loiter with the specific intent of engaging in or soliciting genital, buttock, or female breast touching, intending to perform the act in a public place, a place open to the public or one exposed to public view under circumstances where the actor knew or should know there would be third persons present at the proposed location who might observe the solicited conduct and who might be offender thereby. (See Caswell, supra pp. 390-392.

In 1990 I persuaded the CALJIC Committee to revise element 3 of CALJIC 16.400, the jury instructions for Penal Code section 647(a), lewd conduct, by creating separate instructions for "engaging" and "soliciting" cases. A copy of their letter to me and their 1990 Revision are attached.

Finally, in 1996, I personally argued my career case. Baluyut v. Superior Court, (1996) 12 Cal.4th 826, 911 P. 2d 1 which held that sting operations analogous to that recently conducted by the Fresno Sheriff's Department may violate the Equal Protection clause of the 14th Amendment to the United States Constitution.

I have taught criminal law relating to this type of arrests at national conferences of Lavender Law, sponsored by the National Gay and Lesbian Task Force in Los Angeles, Portland, New Orleans, and Dallas.

In California, and in many states, there is a unique problem with lewd conduct which is not present in any other portion of the Penal Code in that the language in the Penal Code bears absolutely no relation to the crime or its elements. In fact the language in the Penal Code has been determined by the California Supreme Court to be unconstitutionally void for vagueness. However, instead of striking down the statute, the Supreme Court completely redefined the elements in two seminal cases, Pryor v. Municipal Court (1979) 25 Cal.3rd 238, 599 P.2d 636 and my Caswell case, cited above. You absolutely must read these two cases plus People v. Rylaarsdam, (1982) 130

Cal.App.3rd Supp. 1 before you attempt to represent any person for lewd conduct. (CALJIC 16.400 both the hardcover version and the pocket portion also are very helpful in understanding what is and what is not lewd conduct).

The following is an outline on how to handle this case.

• First, when you initially meet your client inquire if the arrest (or the observation leading to the arrest) was made by an undercover decoy officer.

This is crucial, because if he was, then you must immediately assure him that he did not violate California law.

The reason of course is that all lewd conduct (including the loitering portion) require that the defendant must "know or should know of the presence of persons who are likely to be offended by his conduct." (CALJIC 16.400, element 3) Clearly, if the decoy is pretending to be sexually interested in the defendant (and they all do this type of play acting) then the defendant's belief that the person who is observing him is not likely to be offended is a reasonable one and no crime has been committed.

• Second, it is very important to immediately inform your client of this central fact because he is likely to be consumed by shame and guilt over whatever conduct he may have engaged in, even if it only amounted to being there. You must help him overcome his feelings of guilt (which frequently is due to religious and cultural teachings) by stressing the fact that he didn't violate the law.

• Third, as soon as possible have your client write down all the things the decoy deputy did to gain his confidence. Such things as eye contact, suggestive body language, lingering for long periods of time around the toilet, following the client into and out of the bathroom, suggestive conversation all are relevant to the fundamental defense: That at no time did your client reasonably expect to offend

anyone.2/ These things may well acquit him later.3/

• Fourth, carefully examine the citation and note the things he was cited for. The possibilities are PC 647 (a) (soliciting lewd conduct, PC 647(a) (engaging in lewd conduct), PC 647(d), loitering around a toilet, or some combination of the three.4/

• Fifth, carefully question your client to determine the gravamen of his offense: Whether or not he allegedly masturbated somewhere in or around the toilet, whether or not he simply engaged in conversation (i.e. solicited the undercover decoy) or if he simply was there, (loitering). You may have to wait until you get the police report to determine this since, in many cases, the client is so traumatized by his arrest that he won't know precisely what he was arrested for.

• Sixth, inform your client that there may be several ways to have the charges dismissed, short of trial. These include:
a. A demurrer if the facts do not constitute a public offense
b. A motion in arrest of judgement (also if the facts do not constitute a public offense)
c. A motion to suppress evidence (if the viewing was through a crack between the door jam and the stall, or the decoy peered over or under the partition)
d. A motion to dismiss based on discriminatory prosecution pursuant to Murguia v. Municipal Court of Bakersfield (1975) 15 Cal.3rd 286, 540 P.2d 44, and Baluyut v. Superior Court (1996) 14 Cal.4th 826, 911 P. 2d 1, the case I personally argued. I have all of these motions in my computer and am willing to share these with you. However, the last option is very involved and your client must know that such a motion takes several months to matriculate.5/

• Seventh, when you obtain the police report carefully determine what you client is alleged to have done. If the allegation is that he simply "loitered" around the bathroom and that is the only charge, you must file a demurrer or a motion in

arrest of judgement, because there is no crime. Following my Caswell case, (cited above), I have never lost a "loitering" case that did not also include an allegation of actual sexual conduct.

If the allegation is that your client solicited the decoy for some sexual activity, then carefully determine where the solicited act was to be performed. If the act was to be performed at home or at a motel, immediately file a demurrer or a motion in arrest of judgement. Not only will you acquit your client but I will take his case on a contingency basis and sue the Sheriff's department for false arrest.

If the solicitation proposed sexual conduct without specifying where, immediately file a demurrer or a motion in arrest of judgement. In the absence of any specific location, there is no evidence one way or the other that your client intended to perform the act in a public place, and the presumption of innocence will acquit him.

If the solicitation proposed to go to a nearby vehicle or some other remote place, file the demurrer and/or the motion in arrest of judgement. This is precisely the scenario in Baluyut, supra, and the Supreme Court took pains to opine on page 830 that such arrests did not comply with the provisions of Pryor, supra.

If the solicitation proposed that the act take place inside a toilet stall quickly determine whether or not the stall had a door.6/ If it had a door, set the matter for a court trial and call me to argue it. A toilet that has a door is a private place as held in Pryor, supra fn. 12, page 256.7/

Only if the solicitation proposed something truly outrageous, such as: "Lets have sex right here" and "here" is outside the restroom or in the wash basin area, should you consider pleading your client. (I have never encountered such a solicitation in reviewing some 6,000 cases pursuant to various Murguia Motions).

If the allegation is that your client masturbated in a toilet stall, carefully determine how the observation was made. If it was made by a decoy peering through a crack in the partition or above or below the partition file a motion to suppress. If the observation was of four legs appearing below the partition, (but no observation of genital touching) file a demurrer.8/

If the touching was observed through an open door or at the urinal, then focus on the preceding behavior of the decoy. Look for eye contact, suggestive conversation, following the client, foot tapping, standing at a urinal withouturinating, standing at a toilet when a urinal is available, remaining for long periods of time in and around a urinal. This is recognized cruising behavior on the part of the decoy and as such is designed to gain the confidence of your client. While this is permissible in ordinary decoy situations it is not in lewd conduct cases because of the "knows or should know" element which is unique to this offense.

Finally, if the report admits to no such cruising behavior on the part of the decoy and unequivocally states that your client masturbated in his presence without any encouragement, and your client tells you something different, in this case believe your client. From my experience, about 20 per cent of decoy police reports (as opposed to reports made by uniformed officers) contain deliberate falsehoods, sometimes reaching to the gravamen of the offense. You then need to consult with me, other attorneys who may have similar cases, and the public defender's office to see if they are getting the same thing from their clients. If you can find three or more persons whose arrest reports contain similar falsehoods, you can gang up on the cop at trial pursuant to Evidence code 1101 and 1103, habit, pattern of behavior i.e. the Method of Operation ("MO") of the decoy.

Finally, if you have an engaging type arrest, you should consider filing a Murguia Motion pursuant to my Baluyut case. this you need to organize with myself, other local attorneys, and the local Public

Defender's office because this is a huge undertaking. This is the ultimate way to stop these arrests.

**See FOOTNOTES**

# FOOTNOTES (back)

1/ In the 23 years I have practiced law, I have successfully had granted by courts over a dozen Writs of Error Coram Nobis on cases where defendants pled to conduct that was not a crime. Many of these persons were represented by counsel and these found themselves defendants in lawsuits for malpractice.

2/ This is similar to but different from entrapment. Although I always get an entrapment instruction on a decoy arrest (not without a fight usually), this defense based on Element 3 of CALJIC 16.400 requires far less police affirmative conduct. It only needs to be conduct which leads the defendant to the reasonable conclusion that far from being offended by sexual conduct, the decoy is looking for it.

3/ If you ever get a police report where the officer admits to "foot tapping" inside a rest room stall, call me immediately. Foot tapping is a common signal whereby a person inside a restroom stall communicates to a person in an adjacent stall that he is there for a sexual encounter. I have

4/ He also may have been arrested for a violation of PC 314.1, indecent exposure and/or 243.4(d)(1), sexual battery. These require special care because they contain the potential for sex registration pursuant to PC 290, which PC 647(a) and (d) do not. 290 registration for PC 314.1 is completely inappropriate for arrests made by decoys (See In Re Reed, (1983) 33 Cal.3d 914, In Re King, (1984) 157 Cal.App.3d 554, and People v. King, (1996) 16 Cal. App. 4th 557) and may be reversible error to impose it. Registration for sexual battery (where the decoy is inviting the grope) is also inappropriate, but is not so clearly error.

5/ I win approximately one third of these "Murguia" motions. However, even those that are lost, uncover such damning evidence of prejudice and questionable law enforcement practices that many jurisdictions have abandoned decoy operations even after successfully defeating a Murguia Motion. The best example of this is the Fresno Police who have not conducted such a sting operation in three years following a Murguia Motion I filed. Although it was ultimately defeated on procedural grounds, the client was ultimately acquitted by Judge Gene M.

6/ An immediate visit to the site of the arrest, camera in hand, is always important. Doors may be removed, bushes may be trimmed or cut, a thicket may lose its leaves in the Winter, all of which may mean that a setting which made it very unlikely that a member of the public would be offended by the conduct does not now provide such assurances.

7/ This was the alleged fact situation in the Fresno case I court tried before Judge Gomes, who correctly ruled that a solicitation to engage in oral sex to be performed inside a nearby toilet stall was a legal solicitation.

8/ The Superior Court in Modesto, Stanislaus County, granted a demurrer with this fact situation.

in my possession a written (but unpublished) opinion from the Appellate Department of the Superior Court, Orange County no less, that reversed a jury conviction where the decoy cop admitted to foot tapping to entice the defendant to masturbate through a "glory hole" between the two stalls.

Gomes (now on the Court of Appeal) in a court trial based on the police report. Judge Gomes also found my client factually innocent pursuant to PC 851.8 so that he may resume his teaching career.

# Exhibit No. 4

State Bar of CA :: Daniel P. Rawlins - Windows Internet Explorer

C:\Documents and Settings\John\My Documents\Law\Attorneys; Police Officers; Judges; Other\S.D City Atty.s\State Bar of CA Daniel P.

File Edit View Favorites Tools Help

MSN.com MSDN: Micr... MSDN Library Google Google Google News State Bar ... Page Tools

Attorney Resources

Public Services

About the Bar

Member Services

ATTORNEY SEARCH

## Daniel Paul Rawlins - #246830

### Current Status: Active

This member is active and may practice law in California.

See below for more details.

### Profile Information

| | | | |
|---|---|---|---|
| **Bar Number** | 246830 | | |
| **Address** | San Diego City Attorney<br>1200 3rd Ave Ste 700<br>San Diego, CA, 92101 | **Phone Number** | (619) 379-9334 |
| | | **Fax Number** | (858) 503-0011 |
| | | **e-mail** | danrawlins@gmail.com |
| **District** | District 9 | **Undergraduate** | Univ of California Berkeley |

Internet 220%

State Bar of CA :: Joseph L. Allen - Windows Internet Explorer

http://members.calbar.ca.gov/search/member_detail.aspx?x=253302

File Edit View Favorites Tools Help

MSN.com | MSDN: Micr... | MSDN Library | Google | Contact My... | Google News | State Bar ... | Page | Tools

About the Bar

Member Services

## Joseph Lewis Allen - #253302

### Current Status: Active

This member is active and may practice law in California.

See below for more details.

### Profile Information

| | | | |
|---|---|---|---|
| Bar Number | 253302 | | |
| Address | 4505 Newport Ave<br>San Diego, CA, 92107 | Phone Number | (619) 208-8424 |
| | | Fax Number | Not Available |
| | | e-mail | josephlewisallen@hotmail.com |
| District | District 9 | Undergraduate School | Tulane Univ; New Orleans LA |

Internet 230%

John Cobb – Plaintiff.
3955 Mt. Albertine Way
San Diego, CA 92111
Telephone: (858) 277-2026.

////

////

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| John Cobb, Plaintiff,<br>vs.<br>1.) J. Reyes ( ID 606 );<br>2.) S. Gustafson ( ID 601 );<br>3.) Lt. Tom Morris ( ID 691 );<br>4.) William MacIntyre ( ID 617 );<br>5.) Lt. David Rose ( ID 690 );<br>6.) U.C.S.D. Police Chief O. King;<br>Prosecutors:<br>7.) Michael Hudson;<br>8.) Mike Aguirre;<br>9.) Bonnie Dumanis;<br>Public Defenders:<br>10.) Shane McKay;<br>11.) Steven Carroll;<br>12.) Does 1 through 100;<br>Defendants. | **PROOF OF SERVICE.**<br><br>**[ Case Number: 08-cv-0188-JAH-WMc ].**<br><br>Date: June 23, 2008<br>Time: 2:30 p.m.<br>Department: 11.<br>Judge: Hon. John A. Houston. |

////

////



66

# DECLARATION OF SERVICE OF DOCUMENTS

I, Tiffany Techaira, declare:

That I am over the age of eighteen years and not a party to the case. I work at;

THE UPS STORE (#0835), San Diego, California.

On, May 20, 2008, I received three (3) sets of the following documents;

**1.) NOTICE OF OPPOSITION TO MOTIONS TO DISMISS.**

**2.) DECLARATION AND ANALYSIS IN OPPOSITION TO MOTIONS TO DISMISS.**

**3.) POINTS AND AUTHORITIES IN OPPOSITION TO MOTIONS TO DISMISS.**

I mailed a complete set ( all 3 ) of these document to each of the following three defendants;

1.) John J. Sansone, County Counsel, County of San Diego
Stephanie Kish, Senior Deputy
1600 Pacific Highway, Room 355
San Diego, CA 92101-2469

2.) Alfred De La Cruz
John P. Cogger
Manning & Marder, Kass, Ellrod, Ramirez LLP
550 West " C " Street, Suite 1900
San Diego, CA 92101

3.) Michael Aguirre
Kathryn Snyder, Deputy City Attorney
Office of the City Attorney
1200 Third Ave., Suite 1100
San Diego, CA 92101-4100

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 20, 2008. Signed: T. Techaira.

## U.S. Postal Service™ Delivery Confirmation™ Receipt

DELIVERY CONFIRMATION NUMBER: 0303 0130 0001 3866 0655

Postage and Delivery Confirmation fees must be paid before mailing.

Article Sent To: (to be completed by mailer)

(Please Print Clearly) de la Cruz

RECEIVED

POSTAL CUSTOMER:
Keep this receipt. For Inquiries:
Access internet web site at
*www.usps.com* ®
or call 1-800-222-1811

Postmark Here

MAY 20 2008

RECEIVED

5663 Balboa Ave SD CA 92111

MAY 2 0 2008

CHECK ONE (POSTAL USE ONLY)

- Priority Mail™ Service
- First-Class Mail® parcel
- Package Services parcel

PS Form 152, May 2002 (See Reverse)

## U.S. Postal Service™ Delivery Confirmation™ Receipt

DELIVERY CONFIRMATION NUMBER: 0303 0130 0001 3866 0679

Postage and Delivery Confirmation fees must be paid before mailing.

Article Sent To: (to be completed by mailer)

(Please Print Clearly) Tou Sony

RECEIVED

POSTAL CUSTOMER:
Keep this receipt. For Inquiries:
Access internet web site at
*www.usps.com* ®
or call 1-800-222-1811

Postmark Here

MAY 2 0 2008

CHECK ONE (POSTAL USE ONLY)

- Priority Mail™ Service
- First-Class Mail® parcel
- Package Services parcel

5663 Balboa Ave SD CA 92111

PS Form 152, May 2002 (See Reverse)

## U.S. Postal Service™ Delivery Confirmation™ Receipt

DELIVERY CONFIRMATION NUMBER: 0303 0130 0001 3866 0662

Postage and Delivery Confirmation fees must be paid before mailing.

Article Sent To: (to be completed by mailer)

(Please Print Clearly) Asume

RECEIVED

POSTAL CUSTOMER:
Keep this receipt. For Inquiries:
Access internet web site at
*www.usps.com* ®
or call 1-800-222-1811

Postmark Here

MAY 2 0 2008

CHECK ONE (POSTAL USE ONLY)

- Priority Mail™ Service
- First-Class Mail® parcel
- Package Services parcel

5663 Balboa Ave SD CA 92111

PS Form 152, May 2002 (See Reverse)